373 Mass. 401                                                401

Director of the Civil Defense Agency *v.* Civil Service Commission.

DIRECTOR OF THE CIVIL DEFENSE AGENCY AND OFFICE OF EMERGENCY PREPAREDNESS *vs.* CIVIL SERVICE COMMISSION & others.[1]

Suffolk.   May 4, 1977. — September 20, 1977.

Present: HENNESSEY, C.J., QUIRICO, BRAUCHER, KAPLAN, & LIACOS, JJ.

*Civil Defense Agency.   Civil Service.   Governor.   Statute,* Construction.

In a civil action commenced in 1976 by the director of the Civil Defense Agency against the Civil Service Commission and thirty permanent employees of the agency, this court held that the positions of such employees are under civil service, notwithstanding the provision of St. 1950, c. 639, § 2, that employees of the defense agency "shall not be subject to" the civil service laws; all that has occurred since enactment of St. 1950, c. 639, creating the agency, has effected

---

[1] Also joined as defendants were the thirty employees mentioned in the text.

The defendant Civil Service Commission is represented herein by the Attorney General; the plaintiff director by separate counsel.

a supersession of § 2 in substance, it appearing that Governors, by a series of executive orders, had placed offices and positions in the agency under civil service laws and rules, that the Legislature, by St. 1963, c. 807, made many positions in the agency permanent, and that within the agency administrative conduct conformed to civil service procedures. [404-410]

Under G. L. c. 31, § 46A, as appearing in St. 1959, c. 569, § 5, "the employment or compensation" of permanent employees of the Civil Defense Agency who were notified by its director on February 28, 1975, that their employment would terminate on March 28, 1975, was not "affected by action of the appointing authority" until the later date, and complaints filed by such employees with the Civil Service Commission on March 31, 1975, seeking reinstatement with back pay, were filed within the seven day period allowed by § 46A. [410-411]

Statute 1975, c. 684, § 2, item 0432-0001, and § 7, abolishing on its effective date, November 8, 1975, positions of thirty permanent employees of the Civil Defense Agency which had been purportedly terminated by its director on March 28, 1975, did not nullify proceedings by such employees before the Civil Service Commission under G. L. c. 31, § 46A, although the commission hearings had been completed on November 8, 1975, and its order restoring the employees to their positions without loss of compensation was not entered until November 19, 1975. [411-412]

CIVIL ACTION commenced in the Supreme Judicial Court for the county of Suffolk on May 6, 1976.

The case was reserved and reported by *Kaplan, J.*

*Walter H. Mayo, III,* for the plaintiff.

*Alan K. Posner,* Assistant Attorney General, for the Civil Service Commission.

*Augustus J. Camelio* for the employees.

KAPLAN, J. On February 28, 1975, the director of the Civil Defense Agency and Office of Emergency Preparedness (hereafter the Agency) notified the thirty permanent Agency employees here involved that their employment would terminate on March 28, 1975. The reason assigned was that the general economic recession called for a reduction of force. On March 31, 1975, the employees filed complaints with the Civil Service Commission (Commission) under G. L. c. 31, § 46A,[2] seeking reinstatement with back pay, and alleging as cause (what is now virtually conceded

---

[2] For the relevant text of § 46A, see note 16 *infra.*

in point of fact) that the director had failed to comply with G. L. c. 31, § 43 (*a*), in that he had not given the employees a hearing with respect to the basis for the termination.[3] In the proceedings before the Commission which followed, the director defended on the dual grounds that the positions had not been brought under the civil service system so that § 43 (*a*) was inapplicable; but if the positions were covered, then that the employees' complaints failed because they had not been filed within the time limit set by § 46A or for other reasons. The proceedings were divided into two corresponding parts, and the Commission, accepting the recommendations of the respective hearing officers who heard the parties, ruled first that the positions were covered, and then that the complaints should be allowed, and entered an order, dated November 19, 1975, restoring the employees to their positions without loss of compensation or other rights.

The director thereafter commenced the present action in the Supreme Judicial Court for the county of Suffolk joining the Commission and the employees as defendants. He prays a declaration and a vacation of the Commission's order on either of the grounds he had taken, or on another not argued to the Commission, namely, that on November 8, 1975, the Legislature by budget legislation, St. 1975, c. 684, § 2, item 0432-0001, and § 7,[4] had abolished a num-

---

[3] Section 43 (*a*), as it stood at the time (as amended through St. 1970, c. 72, § 1), provided that "[b]efore any action affecting employment" (including discharge) was taken, the employee was to be given "a written statement of the specific reason or reasons for the contemplated action," together with a copy of the relevant statutes, and was also to be given "a full hearing before the appointing authority ... on the specific reason or reasons given," of which he was to have written notice. (With respect to certain of the employees there had been a failure to deliver copies of the statutes as well as omission to provide a hearing.)

[4] Item 0432-0001 under "Civil Defense Agency" cut down permanent positions to not more than fifty-two, as follows: "For the service of the civil defense agency; provided, that expenditures from this item shall be contingent upon the prior approval of the proper federal authorities and shall be expended with at least an equivalent amount of federal funds for the purposes of this item, including not more than fifty-two permanent positions $305,361."

ber of Agency positions, including the thirty in question, thereby — so the director contends — rendering "moot" the proceedings before the Commission and invalidating its order. The case is here on reservation and report, without decision, of a single justice of this court. We shall draw on the record, consisting of the pleadings and a statement of agreed facts with numerous annexes, as becomes appropriate to the issues discussed below.

1. Were the positions under the civil service? The situation is exceptional, and the question is a close one, but we think the answer is yes.

Statute 1950, c. 639, "An Act to provide for the safety of the commonwealth during the existence of an emergency resulting from disaster or from hostile action," created the Agency as one of the instruments to be used by the Governor in preparing for and meeting such exigencies. We note three important features of the act. First, evidently the act was conceived originally as a response to a temporary or passing situation, as indicated by the fact that it was to run only to July 1, 1952, and might be terminated sooner by resolution of the House and Senate acting concurrently (§ 22). (The specific date was changed to July 1, 1953, by St. 1952, c. 269; and by St. 1953, c. 491, that date was removed and the act given indefinite extension subject to joint resolution.) Second, as befitted its volatile and perilous mission, the act delegated to the Governor, as head of the executive branch, very extensive and highly flexible powers both in preparing for and meeting an emergency. Third, the act anticipated and made possible a close relationship between the State and Federal governments in the field of civil defense.

In keeping with the original temporary conception, § 2 of the act provided, with respect to the Agency, that its director, within the limits of amounts appropriated, might appoint such experts, clerks, and other assistants as the work of the Agency required, and that "[s]uch employees shall not be subject to chapter thirty-one of the General Laws [civil service]." The quoted provision has not been superseded in terms by later legislation of the General

373 Mass. 401                                405

Director of the Civil Defense Agency *v.* Civil Service Commission.

Court.[5] The question is whether all that has occurred since the enactment, including not only a realization of the more durable character of the Agency and the civil defense program generally, but also action by the Governor under other provisions of the statute and the adoption of adjacent legislation by the General Court, has effected a supersession in substance.

Among the powers delegated to the Governor was that expressed in § 15 of the act, which stated in part: "Whenever the federal government . . . shall offer to the commonwealth . . . services, equipment, supplies, materials or funds by way of gift, grant or loan, for purposes of civil defense, the commonwealth, acting through the governor . . . may accept such offer, and upon acceptance the governor . . . may authorize any officer of the commonwealth . . . to receive such services, equipment, supplies, materials or funds on behalf of the commonwealth . . . and subject to the terms of the offer and the rules and regulations, if any, of the agency making the offer." Occasion for the use of § 15 arose in 1960 when the President, acting through the Office of Civil and Defense Mobilization in the Executive Office of the President, offered $200,000 to the Commonwealth for civil defense purposes for the balance of the fiscal year to end on June 30, 1961.[6] The offer was conditioned on the placing of positions in the civil defense organization of the Commonwealth on a personnel merit basis[7] by January 1, 1961. Accordingly the Governor on

---

[5] It may be noted here that § 2 was amended in 1970 (St. 1970, c. 112) but that was merely to make a formal change in the name of the Agency and without attention, we think, to the civil service question.

[6] The President was acting pursuant to the Act of Aug. 8, 1958, Pub. L. 85-606, § 4, 72 Stat. 533 (later amended by Pub. L. 88-335, 78 Stat. 231 [1964]; see 50 U.S.C. app. § 2286 [1970 & Supp. III 1973]); and see Presidential Exec. Order No. 10,773, 23 Fed. Reg. 5061, as amended by Exec. Order No. 10,782, 23 Fed. Reg. 6971 (1958).

[7] As required by 50 U.S.C. app. § 2286(a)(4) ("establishment and maintenance of personnel standards on the merit basis"). Section 2286 states further "[t]hat the financial contributions to the States for the purposes of this section shall not exceed one-half of the total cost of

December 7, 1960, issued Executive Order No. 36 which stated in par. 1: "Notwithstanding the provisions of section two of Chapter 639 of the Acts of 1950, as amended, all offices and positions in the ... [Agency], excepting the Director, shall, on January 1, 1961, become subject to the Civil Service laws and rules." (Provision was also made for extending civil service to positions in the local organizations for civil defense.[8]) Considering the maturity of the Agency and of the whole effort, this was not a drastic proposition. The preamble of the Order referred to § 15 and to other statutory provisions for cooperation of the Commonwealth, through the Governor, with the Federal government,[9] as well as to the comprehensive gubernatorial authority vested by the statute over the civil defense program.[10]

Although asserting and buttressing its own legality, the Order indicated frankly and understandably a preference for the adoption of legislation fully to achieve the purpose.

such necessary and essential State and local civil defense personnel and administrative expenses."

[8] Most of the text of the Order was given over to the details of procedure for effecting the change within civil defense organizations of the political subdivisions of the Commonwealth. See St. 1950, c. 639, § 13. Section 15, quoted in part in the text above, spoke of acceptance by the political subdivisions of offers of Federal funds, also "subject to the terms of the offer and the rules and regulations, if any, of the agency making the offer."

[9] Sections 4 and 6 develop further the authority of the Governor to work cooperatively with the Federal government.

[10] Section 4 stated that "[t]he governor shall have general direction and control of the ... [Agency], and shall be responsible for carrying out the provisions of this act and may assume direct operational control over any or all parts of the civil defense functions within the commonwealth." Section 8 (as clarified by St. 1968, c. 579, § 4) stated that the Governor may exercise any power or discretion conferred on him by the act in an emergency or in preparation therefor through the issuance of executive orders (or through instructions or general regulations). By § 8A an order issued under the act superseded any provision of a general or special law to the extent the latter was inconsistent. Section 20 authorized the Governor to make, amend, and rescind orders, rules and regulations pertaining to civil defense, and prohibited inconsistent rules or regulations of other governmental agencies of the Commonwealth. For the Governor's comprehensive emergency powers, see §§ 5, 7.

373 Mass. 401        407

Director of the Civil Defense Agency *v.* Civil Service Commission.

As the reason for issuing an Order, the preamble mentioned the virtual impossibility of securing legislative action by January 1, 1961; and the Order, which ran to the end of the fiscal year, stated that it was to terminate at any earlier date on which legislation should be adopted confirming the Order or otherwise establishing the civil service status. In fact there was activity in the Legislature on the subject during 1960-1962, but it petered out for no particular reason that can be derived with any assurance from the legislative record.[11] Therefore, in order to continue to qualify the Commonwealth for matching Federal funds (see note 7 *supra*), further executive orders were issued declaring the civil service status.[12] The last effective order speaking on July 11, 1962,[13] was without limit of time. It has not been rescinded.

Although the Legislature took no definitive action on the civil service question, it did take such action in 1963 on a closely related matter. By St. 1963, c. 807, one hundred five positions in the Agency were made permanent. The recital of the statute stated: "*Whereas,* Federal contributions to the civil defense agency may be discontinued if present temporary positions in said agency are not made permanent forthwith, therefore this act is hereby declared to be an emergency law, necessary for the immediate preservation of the public convenience." But Federal contributions would just as surely have been discontinued if the Agency positions were not brought under the civil service. A natural implication is that it was accepted that that had been already accomplished, although by the executive route. The same implication is invited, and perhaps

---

[11] Without tracing the legislative moves and retreats in detail, we may mention Governor Furcolo's message to the General Court, 1960 House Doc. No. 3265; Governor Volpe's two requests, 1961 House Doc. No. 2937, 1961 Senate Doc. No. 684; and the last bill introduced, 1962 House Doc. No. 901.

[12] See Executive Orders Nos. 38 (March 12, 1961), 39 (May 1, 1961), 41 (August 30, 1961), 42 (September 15, 1961), and 42A (July 11, 1962).

[13] Executive Order No. 42, as amended by Executive Order No. 42A.

even more strongly, by the fact that the Legislature was repeatedly making appropriations for civil defense knowing that receipt of the counterpart funds was contingent on compliance with Federal requirements (see note 4 *supra*). The vital importance of Federal funding need not be underlined.

Within the Agency, administrative conduct conformed to civil service procedures. It was shown in the Commission proceedings that job seekers were first made aware of openings in the Agency by civil service announcements; that applicants were required to take civil service examinations in order to qualify; that names to fill the positions were requisitioned from the appropriate civil service lists; that jobs were upgraded by reference to civil service standards — in short, the positions, including the thirty in question, were treated as blanketed by civil service.[14] And vis-à-vis the Federal government, the Commonwealth was representing repeatedly that personnel standards in the civil defense organization were on a merit basis.

To sum up: We believe — although, as indicated below, decision need not necessarily rest on this ground — that there is a good reason to hold that the Governors had, and properly exercised, delegated authority in the circumstances of the case to place the Agency positions under civil service. The authority inhered in the civil defense statute itself. That the effect of the exercise of the power was to supersede a provision of the very statute is not so extraordinary as to bring into serious question the existence of the power. The situation is comparable to one which would raise little difficulty: take a regulatory statute under which an administrator is authorized to make a determination either invoking an otherwise dormant pro-

---

[14] The director of Civil Service expressed the view in writing in 1971 that employees of the Agency (other than its director) were under civil service, a view that was reexamined and upheld in the Commission proceedings in the present case.

We reach our conclusion in this opinion without attaching particular weight to the Commission's decision on a question of law related to its jurisdiction.

373 Mass. 401 409

Director of the Civil Defense Agency *v.* Civil Service Commission.

vision of the statute, or rendering inoperative an otherwise active provision; under the civil defense statute, indeed, emergency powers are contingent on the Governor's proclamation.

The case of *Nichols* v. *Commissioner of Pub. Welfare,* 311 Mass. 125 (1942), does not, we think, stand in the way of our conclusion. There the Commissioner of Public Welfare promulgated rules of his own which, as the record shows, were similar to, but not the same as the civil service laws and rules, in order to create a merit system that could meet the requirements for obtaining Federal funds for old age assistance and aid to dependent children. This court indicated in dictum that the Commissioner's rules would not have been valid, but the distinguishing fact is that, whereas the State legislation there involved contained no such negative as § 2 of our civil defense statute, the Commissioner was not able to point to provisions either expressing or implying an adequate delegation of power to him to accomplish his purpose. This distinguishes *Nichols* from the present case, even without reference to the differences of background and the commanding position of the Governor under the civil defense statute.

In fact, the Legislature in the *Nichols* situation had promptly ratified the Commissioner's rules, which rendered the question of the Commissioner's anterior power unimportant. "The Legislature may confirm, adopt and ratify the acts of a public officer in excess of his authority if the Legislature could have originally granted such authority to the officer, provided vested rights are not impaired by such subsequent legislation." *Id.* at 128-129. In the present case, the failure of the Legislature to respond to the Governors' requests with a definite enactment cannot be taken as a disapproval or a questioning of the executive orders; it is just as compatible, and possibly more so, with approval of, or contentment with the Orders. (On the difficulty of making inferences from legislative inaction, see *Diaz* v. *Eli Lilly & Co.,* 364 Mass. 153, 166 n.44 [1973].) The affirmative conduct of the Legislature in passing the 1963 statute, and in repeatedly making

410 373 Mass. 401

Director of the Civil Defense Agency v. Civil Service Commission.

appropriations that attracted Federal contributions dependent upon a merit system being in effect, can well be taken as a practical confirmation or ratification of the executive orders even if the latter were in themselves inadequate. Such confirmation or ratification can be raised from a course of legislative behavior and need not be set out in a statute in haec verba. See *Fleming* v. *Mohawk Wrecking & Lumber Co.*, 331 U.S. 111, 116 (1947); *Brooks* v. *Dewar*, 313 U.S. 354, 360-361 (1941); *Swayne & Hoyt, Ltd.* v. *United States*, 300 U.S. 297, 301-303 (1937); *Isbrandtsen-Moller Co.* v. *United States*, 300 U.S. 139, 146-148 (1937).

The defendants urge as an additional point that the director should be held estopped, by his holdings-out to the employees and their reliance, to deny that they were covered by civil service, and the case for estoppel is strong if the government is just as amenable to that doctrine as a private party would be. We need not reach such a question here. See *Building Inspector of Lancaster* v. *Sanderson*, 372 Mass. 157, 161-164 (1977); *Chilson* v. *Zoning Bd. of Appeal of Attleboro*, 344 Mass. 406, 412 (1962); *Collins* v. *Boston*, 338 Mass. 704, 709 (1959). But the long-continued administrative practice in dealing with employees may be availed of as having a bearing on what is a correct reading of the extent of the delegated powers under the statute if that be thought otherwise doubtful. See *Cleary* v. *Cardullo's, Inc.*, 347 Mass. 337, 343-344 (1964).[15]

2. Assuming that there must be strict compliance with the time specified by G. L. c. 31, § 46A,[16] for the filing of

---

[15] The employees have not pressed a possible contention (under the supremacy clause) that they have civil service rights based upon the Federal statute conditioning Federal aid on the State's maintenance of a merit system. Cf. *Townsend* v. *Swank*, 404 U.S. 282 (1971); *California Dep't of Human Resources Dev.* v. *Java*, 402 U.S. 121 (1971); Tomlinson & Mashaw, The Enforcement of Federal Standards in Grant-in-Aid Programs: Suggestions for Beneficiary Involvement, 58 Va. L. Rev. 600, 630-637 (1972).

[16] The second paragraph, first sentence, of § 46A (as appearing in St. 1959, c. 569, § 5) stated: "If any person alleges that his employment or compensation has been affected by action of the appointing authority

the employee's complaint (cf. *Schulte* v. *Director of the Div. of Employment Security,* 369 Mass. 74 [1975]), we think there was no failure here. The words "employment or compensation has been affected by action of the appointing authority" refer, not to the appointing authority's expression of an intention to terminate employment at a future date, but to the actual termination of employment and cutting off of pay. Until that time it is not known that the procedures required by § 43 (*a*) have been denied, and of course even the intention to terminate may be abandoned. The crucial date, then, was March 28, 1975, and the employees' complaints were filed within the seven days.[17]

3. The director argues that the proceedings before the Commission must be nullified because of the abolition of the positions involved. On the date of that abolition — November 8, 1975, the effective date of the relevant legislation — the Commission hearings had been completed and decision was to be rendered in a week's time. We should not embrace easily the result that all must be thrown away and the employees remitted to a fresh law suit, if any can be now maintained.

The director contends that the Commission's competence even to award back pay is dependent on there being a position to which the employee can be restored at the time of the Commission's decision. This is to read in a

---

in failing to follow the requirements of section forty-three, he may file a complaint with the civil service commission within seven days, exclusive of Saturdays, Sundays and holidays, after the said action has been taken." (There has been a statutory amendment since to allow ten days. St. 1975, c. 557, § 2.)

[17] This interpretation seems to us also supported by (i) the third sentence of the second paragraph of § 46A which assumes an actual termination, as it speaks of "restoring" the complainant to employment; (ii) the third sentence of § 43 (*a*), where the phrase "action affecting employment or compensation" also appears to refer to actual termination.

See also cases interpreting the first paragraph of § 46A: *Coyne* v. *City Manager of Cambridge,* 331 Mass. 270, 273 (1954); *Branche* v. *Fitchburg,* 306 Mass. 613, 615 (1940).

Reliance for a contrary interpretation on *Chartrand* v. *Registrar of Motor Vehicles,* 345 Mass. 321, 327-328 (1963), seems misplaced.

wooden way the closing words of the second paragraph of § 46A that the Commission "may order the said appointing authority to restore immediately said person to his employment without loss of compensation or other rights."[18] Such a statement of the remedy appropriate in the usual case should not oust the Commission in the unusual case. Indeed, if correspondence not only with the intent but the words of the statute is wanted, one can say fairly that abolition of the position does not prevent reinstatement but simply limits the period for which it can be ordered. See an analogous situation in *Letteney* v. *Commissioner of Commerce & Dev.*, 358 Mass. 10, 12-13 (1970). It may be noted that, besides entitlement to back pay, employees in such cases may have continuing rights to certain kinds of preferment within the system. See G. L. c. 31, § 46G.

The case is returned to the single justice for the entry of an appropriate judgment for the defendants.

*So ordered.*

18 We find unconvincing an argument by the director based on the evolution of § 46A.