STUDENT NO. 9[1] & others[2] *vs.* BOARD OF EDUCATION & others.[3]

Suffolk. November 6, 2003. - January 27, 2004.

Present: MARSHALL, C.J., GREANEY, IRELAND, SPINA, COWIN, SOSMAN, & CORDY, JJ.

*Board of Education. Massachusetts Comprehensive Assessment System Examination.*

Discussion of the statutory and regulatory background of the Massachusetts Comprehensive Assessment System examination. [754-761]

In a civil action brought by public school students in the high school class of 2003, challenging the facial validity of 603 Code Mass. Regs. § 30.03 (2000), a regulation adopted by the defendants that required all public high school students in the class of 2003 to pass the tenth grade English language arts and mathematics section of the Massachusetts Comprehensive Assessment System (MCAS) examination in order to graduate from high school, the judge properly denied the plaintiffs' application for a preliminary injunction enjoining the defendants from enforcing the regulation, where the plaintiffs failed to meet their heavy burden of demonstrating that the regulation's limitation of the competency determination, or graduation requirement, to the English language arts and mathematics sections of the MCAS examination conflicted with G. L. c. 69, § 1D, fourth par., (I), in that the language in the statute did not prohibit the phasing-in of core subjects over time and as curriculum frameworks were revised and finalized [762-767]; moreover, because the judge correctly determined that the plaintiffs had not shown that there was a likelihood of success on the facial challenge made, this court saw no need to consider the judge's determination that the plaintiffs had not shown irreparable harm in the degree needed to obtain a preliminary injunction [767]. IRELAND, J., concurring.

CIVIL ACTION commenced in the Superior Court Department on January 7, 2003.

---

[1] A minor, by her mother and next friend, "EV."

[2] Five public school students in the high school class of 2003, on behalf of themselves and on behalf of other students similarly situated. Eight other public school students, named in the original and in the first amended complaint, have since been dismissed from the case.

[3] The Department of Education (department), the chairman of the Board of Education, and the Commissioner of Education (commissioner).

An emergency motion for a preliminary injunction was heard by *Margot Botsford*, J.

The Supreme Judicial Court granted an application for direct appellate review.

*Thomas C. Frongillo* (*David S. Godkin* with him) for the plaintiffs.

*Pierce O. Cray*, Assistant Attorney General (*John R. Hitt*, Assistant Attorney General, *Rhoda Schneider*, & *Lucy Wall* with him) for the defendants.

*David M. Mandel*, for Massachusetts Association of Vocational Administrators, amicus curiae, was present but did not argue.

The following submitted briefs for amici curiae:

*Joel Z. Eigerman* & *Sumner Z. Kaplan* for Jewish Alliance for Law & Social Action & others.

*Sarah R. Wunsch* for American Civil Liberties Union of Massachusetts.

*Thomas J. Dougherty, Kurt Wm. Hemr, Alisha Quintana,* & *Stephen J. Finnegan* for Massachusetts Association of School Committees.

*John H. Walsh* for Michael Colin Walsh & others.

*Henry C. Dinger* & *Benjamin M. Wattenmaker* for Massachusetts Business Alliance for Education & others.

*Mark Alan Perkins* for Massachusetts Coalition for Authentic Reform in Education & others.

*David Lee Turner*, Town Counsel, for town of Brookline.

GREANEY, J. The plaintiffs, public school students in the high school class of 2003, challenge the facial validity of 603 Code Mass. Regs. § 30.03 (2000), a regulation adopted by the Board of Education (board), which required them to pass the tenth grade English language arts and mathematics sections of the Massachusetts Comprehensive Assessment System examination (MCAS exam) in order to graduate from high school.[4] The plaintiffs sought a preliminary injunction enjoining the defendants from enforcing the regulation and from requiring

---

[4]The eight plaintiffs named in the original and first amended complaints either have passed the MCAS exam or have been granted a "performance appeal" (explained *infra*), thus rendering them eligible to graduate.

students in the high school class of 2003 to pass the tenth grade English language arts and mathematics sections of the MCAS exam as a prerequisite to the award of a high school diploma. A judge of the Superior Court denied the preliminary injunction, and the plaintiffs appealed. We granted the plaintiffs' application for direct appellate review and now affirm the judge's order.

1. The background of the case is as follows. In *McDuffy* v. *Secretary of the Executive Office of Educ.*, 415 Mass. 545, 617-619 (1993), this court held that the Massachusetts Constitution imposes an enforceable duty on the Commonwealth to ensure that all children in its public schools receive an education that is to include certain specific training.[5] Virtually simultaneously with the June 15 release of the *McDuffy* decision, the Legislature by emergency preamble, on June 18, 1993, enacted the Education Reform Act of 1993 (Act), St. 1993, c. 71. Section 27 of the Act, which rewrote G. L. c. 69, § 1, sets forth its intent and purpose in the following terms:

> "It is hereby declared to be a paramount goal of the [C]ommonwealth to provide a public education system of sufficient quality to extend to all children[6] the opportunity to reach their full potential and to lead lives as participants

---

[5]That training was described as follows:

"(i) sufficient oral and written communication skills to enable students to function in a complex and rapidly changing civilization; (ii) sufficient knowledge of economic, social, and political systems to enable students to make informed choices; (iii) sufficient understanding of governmental processes to enable the student to understand the issues that affect his or her community, state, and nation; (iv) sufficient self-knowledge and knowledge of his or her mental and physical wellness; (v) sufficient grounding in the arts to enable each student to appreciate his or her cultural and historical heritage; (vi) sufficient training or preparation for advanced training in either academic or vocational fields so as to enable each child to choose and pursue life work intelligently; and (vii) sufficient level of academic or vocational skills to enable public school students to compete favorably with their counterparts in surrounding states, in academics or in the job market."

*McDuffy* v. *Secretary of the Executive Office of Educ.*, 415 Mass. 545, 618-619 (1993), quoting *Rose* v. *Council for Better Educ., Inc.*, 790 S.W.2d 186, 212 (Ky. 1989).

[6]The Legislature subsequently amended G. L. c. 69, § 1, specifically to include, in those children covered, a school age child with a disability as

in the political and social life of the [C]ommonwealth and as contributors to its economy. It is therefore the intent of this title to ensure: (1) that each public school classroom provides the conditions for all pupils to engage fully in learning as an inherently meaningful and enjoyable activity without threats to their sense of security or self-esteem, (2) a consistent commitment of resources sufficient to provide a high quality public education to every child, (3) a deliberate process for establishing and achieving specific educational performance goals for every child, and (4) an effective mechanism for monitoring progress toward those goals and for holding educators accountable for their achievement."

St. 1993, c. 71, § 27.

Of relevance are three sections of G. L. c. 69, namely, §§ 1D, 1E, and 1I, which were inserted by St. 1993, c. 71, § 29. These provisions imposed various obligations on the commissioner and the board, in furtherance of education reform, including obligations to develop "academic standards" and "curriculum frameworks" in certain "core subjects." See G. L. c. 69, § 1D, 1E. First, the board, through the commissioner, was required "to institute a process to develop academic standards for the core subjects of mathematics, science and technology, history and social science, English, foreign languages and the arts."[7] *Id.* at § 1D, second par. Second, the board was required to direct the commissioner "to institute a process for drawing up curriculum frameworks for the core subjects covered by the academic standards provided in [§ 1D]." *Id.* at § 1E, first par.

defined in G. L. c. 71B, § 1, and a limited English proficient student as defined in G. L. c. 71A, § 1. See St. 2000, c. 159, § 134; St. 2002, c. 218, § 1A.

[7]Pursuant to G. L. c. 69, § 1D, second par., "[t]he standards shall cover grades kindergarten through twelve and shall clearly set forth the skills, competencies and knowledge expected to be possessed by all students at the conclusion of individual grades or clusters of grades." In addition, "[t]he standards shall provide for instruction in at least the major principles of the Declaration of Independence, the United States Constitution, and the Federalist Papers." *Id.* at § 1D, third par.

The plaintiffs claim that the total number of "core subjects" is seven, rather than five, because they construe "science and technology" as two subjects and "history and social science" as two subjects. The distinction is not relevant to the appeal.

The curriculum frameworks "shall present broad pedagogical approaches and strategies for assisting students in the development of the skills, competencies and knowledge called for by these standards. . . . They shall provide sufficient detail to guide the promulgation of student assessment instruments." *Id.*

The Act imposed on the board an obligation to create objective "assessments" to measure both school and student performance. See G. L. c. 69, § 1I, first, second, and third pars., inserted by St. 1993, c. 71, § 29.[8] The first three paragraphs of § 1I, provide, in pertinent part:

"The board shall adopt a system for evaluating on an annual basis the performance of both public school districts and individual public schools. With respect to individual schools, the system shall include instruments designed to assess the extent to which schools and districts succeed in improving or fail to improve student performance, as defined by student acquisition of the skills, competencies and knowledge called for by the academic standards and embodied in the curriculum frameworks established by the board pursuant to [§§ 1D and 1E] in the areas of mathematics, science and technology, history and social science, English, foreign languages and the arts, as well as by other gauges of student learning judged by the board to be relevant and meaningful to students, parents, teachers, administrators, and taxpayers.

"The system shall be designed both to measure outcomes and results regarding student performance, and to improve the effectiveness of curriculum and instruction. In its design and application, the system shall strike a balance among considerations of accuracy, fairness, expense and administration. *The system shall employ a variety of assessment instruments on either a comprehensive or statistically valid sampling basis. Such instruments shall be criterion referenced, assessing whether students are meeting the academic standards described in this chapter. As much as is practicable, especially in the case of students whose performance is difficult to assess using*

---

[8]Subsequent amendments to G. L. c. 69, § 1I, have no bearing on these quoted paragraphs of the statute.

*conventional methods, such instruments shall include consideration of work samples, projects and portfolios, and shall facilitate authentic and direct gauges of student performance.* Such instruments shall provide the means to compare student performance among the various school systems and communities in the [C]ommonwealth, and between students in other [S]tates and in other nations, especially those nations which compete with the [C]ommonwealth for employment and economic opportunities. . . .

"*In addition, comprehensive diagnostic assessment of individual students shall be conducted at least in the fourth, eighth and tenth grades. Said diagnostic assessments shall identify academic achievement levels of all students in order to inform teachers, parents, administrators and the students themselves, as to individual academic performance.* The board shall develop procedures for updating, improving or refining the assessment system." (Emphases added.)

The Act also amended G. L. c. 69 to impose a graduation requirement called the "competency determination." G. L. c. 69, § 1D, inserted by St. 1993, c. 71, § 29. The provision reads, in pertinent part:

"*The 'competency determination' shall be based on the academic standards and curriculum frameworks for tenth graders in the areas of mathematics, science and technology, history and social science, and English,*[9] *and shall represent a determination that a particular student has demonstrated mastery of a common core of skills, competencies and knowledge in these areas, as measured by the assessment instruments described in [§ 1]. Satisfaction of the requirements of the competency determination shall be a condition for high school graduation.* If the particular student's assessment results for the tenth grade do not demonstrate the required level of competency, the student shall have the right to participate in the assessment program for the following year or years. Students who fail to satisfy the requirements of the competency determina-

---

[9] Foreign languages was added by St. 1994, c. 317. The only core subject omitted from the competency determination is "the arts."

tion may be eligible to receive an educational assistance plan designed within the confines of the foundation budget to impart the skills, competencies and knowledge required to attain the required level of mastery. . . ." (Emphasis added.)

*Id.* at § 1D, fourth par., (i).[10] All high school students attending public schools, including vocational high schools and charter schools, and all students educated with State funds, are subject to the competency determination.

The Act granted extensive authority to the board:

> "The board shall establish such other policies as it deems necessary to fulfill the purposes of this chapter . . . . In accordance with the provisions of [G. L. c. 30A], the board may promulgate regulations as necessary to fulfill said purposes. Said regulations shall be promulgated so as to encourage innovation, flexibility and accountability in schools and school districts."

G. L. c. 69, § 1B, twenty-fourth par., inserted by St. 1993, c. 71, § 29.

The board undertook its mandate to implement the Act and, over time, established curriculum frameworks for all core subjects and formulated the MCAS exam. The exam is a customized test, designed by a national testing company specifically for Massachusetts to be closely aligned with the curriculum frameworks. The MCAS exam contains multiple-choice questions; short answer questions requiring responses ranging from a number or a few words to several sentences; open response questions, requiring students to write a detailed or descriptive answer up to one-half page long, or a chart or graph; and writing prompts, requiring students to write a composition that develops an idea coherently and uses proper punctuation, spelling, and grammar. There are four levels of "performance levels," or scores, for the MCAS exam. A scaled score of 200-219 corresponds to "failing," a scaled score of 220-238 corresponds to "needs improvement," a scaled score of 240-258

---

[10]An uncodified section of the Act provides that "the competency determination shall not be a condition for high school graduation until September first, [1998]." St. 1993, c. 71, § 82.

corresponds to "proficient," and a scaled score of 260-280 corresponds to "advanced."

The MCAS exam was administered for the first time in May, 1998, and initially covered the core subjects of English language arts, mathematics, and science and technology. On May 1, 1998, the department publicly announced that the MCAS exam in four subjects — English, mathematics, science, and social studies — would be used as the high school competency determination, or graduation requirement, called for in G. L. c. 69, § 1D, to begin with students enrolled in the tenth grade in 2001, who would be graduating in 2003.

In 1998, forty-two per cent of eighth graders taking the MCAS exam failed the mathematics section, fourteen per cent failed the English section, and forty-one per cent failed the science and technology section. The same year, fifty-two per cent of tenth graders failed the mathematics section, twenty-eight per cent failed the English section, and thirty-six per cent failed the science and technology section. In 1999, forty per cent of eighth graders taking the MCAS exam failed the mathematics section, thirteen per cent failed the English section, forty-five per cent failed the science and technology section, and forty-nine per cent failed a newly added history section. That same year, fifty-three per cent of tenth graders failed the mathematics section, thirty-two per cent failed the English section, and thirty-eight per cent failed the science and technology section. Tenth grade students were not tested in history. Board minutes indicated that, at least in part because of those results, the board, in 1999, began to discuss the possibility of phasing various core subjects into the MCAS exam graduation requirement. The board adopted the challenged regulation, 603 Code Mass. Regs. § 30.03, on January 25, 2000, and the regulation became effective on February 18, 2000. The regulation provides:

> "Students in the graduating class of 2003 shall meet or exceed the Needs Improvement threshold scaled score of 220 on both the English Language Arts and the Mathematics MCAS grade 10 tests in order to satisfy the requirements of the Competency Determination. The Board

intends to raise the threshold scaled score required for the Competency Determination in future years."[11]

The board also adopted a regulation, 603 Code Mass. Regs. § 30.05, that creates an alternate way for students to satisfy the graduation requirement. The regulation establishes a "performance appeals" process that allows a student to satisfy the MCAS grade ten exam requirement despite a nonpassing score. 603 Code Mass. Regs. § 30.05(1), (10). The regulation contains several waivable eligibility requirements, including scoring at least a score of 216 on a prior MCAS exam. *Id.* at § 30.05(3)(b), (4). No performance appeal can be brought for a student whose knowledge in English language arts and mathematics does not at least meet "a performance level equivalent to 220 on the MCAS grade 10 test required for the [c]ompetency [d]etermination."[12] *Id.* at § 30.05(1).

Approximately six months after the board promulgated the regulation, the Legislature, by St. 2000, c. 159, § 137, amended § 1I of G. L. c. 69 to require certain school districts to prepare "MCAS success plans." Section 1I provides that:

> "Each school district in which more than [twenty] per cent of the students score below level two [i.e., needs improvement] on the [MCAS] exam . . . shall submit an MCAS success plan to the department. The plan shall describe the school district's strategies for helping each student to master the skills, competencies and knowledge

---

[11]Effective July, 2003, the regulation, as amended, reads as follows:

> "Students *starting with* the graduating class of 2003 shall meet or exceed the Needs Improvement threshold scaled score of 220 on both the English Language Arts and the Mathematics MCAS grade 10 tests in order to satisfy the requirements of the Competency Determination. The Board intends to raise the threshold scaled score required for the Competency Determination *and add additional subjects* in future years" (emphasis added).

[12]For students with significant disabilities who are unable to participate in the standard MCAS exams, even with accommodations, the MCAS "alternate assessment" is available and may be used to satisfy the graduation requirement. The alternate assessment consists of a collection of tangible work products, assembled in a portfolio, of an individual student's performance and achievement of the curriculum frameworks.

required for the competency determination described in [§ 1D, fourth par., (i)]."

The Legislature has also specifically made reference to the MCAS exam in numerous budget line items. The Legislature appropriated funds in the fiscal year (FY) 2003 budget for intensive education programs to assist students in passing the MCAS exam. See St. 2002, c. 184, § 2, line item 7061-9404. Additional funds were appropriated in the FY 2004 budget, some directed toward helping students "in the graduating classes of 2003, 2004, and 2005 who have not obtained a competency determination on either the tenth grade English or math MCAS exams." See St. 2003, c. 26, § 2, line item 7061-9404. Both branches of the Legislature also rejected amendments to the FY 2004 budget that would have eliminated the MCAS graduation requirement for students in the classes of 2003 and 2004. See 2003 House J. 261; 2003 Senate J. 242-243.

By March, 2003, approximately ninety per cent of the members of the high school graduation class of 2003 had passed the tenth grade English and math MCAS exams, making them eligible for high school graduation, compared to only sixty-eight per cent when the class first took the exam in 2001. High school juniors and seniors who, as of March, 2003, had not yet passed were given an opportunity to participate in intensive English and mathematics remedial programs, and were permitted to take the MCAS exam again in May, 2003, in time for graduation in June. Students who failed the May, 2003, MCAS exam were given the opportunity to attend free remediation classes during the summer and to take the exam again in August, 2003. Also, the board and the department worked to develop remedial education programs in community colleges and workplace settings for students who satisfied local graduation requirements but had not yet obtained the competency determination. These students have been permitted, at no cost, to take further MCAS exams as many times as they choose. The board has established a "certificate of attainment" that school committees may award to students who meet local high school graduation requirements, but who do not qualify for a diploma because they have not passed the English language arts or mathematics sections of the MCAS exam.

The plaintiffs are members of the high school class of 2003. With one exception, the plaintiffs are public school students. One plaintiff, who is blind, is enrolled at public expense at the Perkins State School for the Blind. Some of the plaintiffs have one or more disabilities and have received special education services. One student has limited English proficiency. All of the plaintiffs have satisfied local graduation requirements, and would have graduated but for their failure to pass either or both the English language arts and mathematics sections of the MCAS exam. Several of the plaintiffs have failed multiple administrations of the mathematics section of the MCAS exam. One plaintiff, on four occasions, has failed both the English language arts and mathematics sections of the MCAS exam, despite his participation in remediation programs. This plaintiff was told that his cohort (class size) was too small to permit a performance appeal.

2. The judge applied the established test in assessing the plaintiffs' application for a preliminary injunction, see *Tri-Nel Mgt., Inc.* v. *Board of Health of Barnstable*, 433 Mass. 217, 219 (2001), and she kept in mind the additional requirement that, when a party seeks to enjoin governmental action, the judge must also consider whether the grant of an injunction would adversely affect the public interest. See *Landry* v. *Attorney Gen.*, 429 Mass. 336, 343 (1999), cert. denied, 528 U.S. 1073 (2000). The judge also correctly recognized that the significant remedy of a preliminary injunction should not be granted unless the plaintiffs had made a clear showing of entitlement thereto. *Id.*

The plaintiffs argue essentially that the regulation is facially invalid because it operates ultra vires in conflict with several provisions of the Act. In challenging the regulation, the plaintiffs have the burden, a formidable one, of demonstrating its illegality. See *Massachusetts Fed'n of Teachers* v. *Board of Educ.*, 436 Mass. 763, 771 (2002); *Greenleaf Fin. Co.* v. *Small Loans Regulatory Bd.*, 377 Mass. 282, 293 (1979). An administrative agency, like the board, has considerable leeway in interpreting a statute it is charged with enforcing, and regulations adopted by the agency stand on the same footing as statutes, with reasonable presumptions to be made in favor of

their validity. See *Massachusetts Fed'n of Teachers* v. *Board of Educ., supra*; *Nuclear Metals, Inc.* v. *Low-Level Radioactive Waste Mgt. Bd.*, 421 Mass. 196, 210-211 (1995); *Quincy* v. *Massachusetts Water Resources Auth.*, 421 Mass. 463, 468 (1995). A court will not declare a regulation void unless its provisions cannot, in any appropriate way, be interpreted in harmony with the legislative mandate. See *Massachusetts Fed'n of Teachers* v. *Board of Educ., supra*, and cases cited.

The plaintiffs' central contention is that the regulation's limitation of the competency determination, or graduation requirement, to the English language arts and mathematics sections of the MCAS exam conflicts with G. L. c. 69, § 1D, fourth par., (i), which states that the " 'competency determination' *shall* be based on the academic standards and curriculum frameworks for tenth graders in the areas of mathematics, science and technology, history and social science, foreign languages, and English" and must indicate that "a particular student has demonstrated mastery of a common core of skills, competencies and knowledge in *these areas* . . ." (emphases added). Thus, the plaintiffs conclude, the regulation's use of the MCAS exam is unlawful because the competency determination does not take into account the other core subjects mentioned in the statute.

The language of § 1D, fourth par., (i), and the use of the word "shall," has to be read to effectuate the Legislature's purpose in passing the Act, with attention to the fact that the Legislature has entrusted the board with the Act's implementation. The requirement that the competency determination "shall" be based on multiple subject areas cannot be construed as permissive in the sense that the board can omit entirely and permanently any core subject it chooses. We agree with the judge that, in view of the purpose of § 1D to establish a certain level of knowledge and skills as a prerequisite to graduation, the statute reasonably should be interpreted to direct the board to create a competency determination including multiple subject areas while permitting the board, in its discretion, to phase in those subjects in a reasonable manner and on a reasonable timetable.

The language in § 1D quoted by the plaintiffs does not ad-

dress the timing or sequence of the implementation of the graduation requirement (except that it could not occur prior to 1998). There is no express prohibition in the statute concerning the phasing-in of core subjects over time and as curriculum frameworks become revised and finalized. Construing the statute to require the board to delay implementation of the competency determination until it made competence in *every* core subject a graduation requirement would only delay education reform and frustrate significantly the accomplishment of the Legislature's purpose in enacting § 1D, fourth par., (i), an undesirable result that is to be avoided if reasonably possible. See *North Shore Realty Trust* v. *Commonwealth*, 434 Mass. 109, 112 (2001); *Watros* v. *Greater Lynn Mental Health & Retardation Ass'n, Inc.*, 421 Mass. 106, 113 (1995). "Where the focus of a statutory enactment is reform, the administrative agency charged with its implementation should construe it broadly so as to further the goals of such reform." *Massachusetts Fed'n of Teachers* v. *Board of Educ., supra* at 774. The board, therefore, could permissibly exercise its discretion by the form of pragmatic gradualism it undertook, particularly because the fundamental subjects of English language arts and mathematics can be considered the basic foundational requirements with which other core subjects can be studied and mastered. Put more colloquially, the board could properly conclude that a student should have competence in "reading, writing, and arithmetic" before being tested on competence in science, history, and other areas.

We reject the plaintiffs' contention that our construction conflicts with the Act's purpose of holding educators accountable. Rather, the implementation of the regulation is a large stride in accomplishing that goal. Educators have established the required academic standards and curriculum frameworks, and have implemented the competency determination in the subjects of English language arts and mathematics. To be sure, the defendants have not been, and are in no way, excused from requiring a demonstration of competence in the other core subjects as a graduation requirement, and the defendants

acknowledge as much.[13] There is no record support for, and no substance to, the plaintiffs' argument that because the graduation requirement has not yet been based on the other core subjects, the students educated in this State with public funds are not being provided with a "comprehensive education." Nothing in the *McDuffy* decision requires a graduation requirement, let alone a graduation requirement based on an assessment of multiple subjects. Simply put, enjoining the regulation, and enjoining the defendants from requiring the plaintiffs to pass the tenth grade English language arts and mathematics sections of the MCAS exam as a prerequisite to receiving a high school diploma, would undermine educator accountability and hinder education reform.

Our interpretation of the regulation finds additional strong support in two other sources. The first source arises out of other provisions of the Act that give broad discretion to the board to carry out its responsibilities. See St. 1993, c. 71, § 29.[14] The

---

[13]The frustration of the plaintiffs in waiting what will be more than ten years for the full implementation of the Act is understandable, but that delay does not render the regulation invalid. The plaintiffs are not left without a remedy, as their second amended complaint seeks a declaration requiring the defendants to comply with G. L. c. 69, §§ 1D, fourth par., (i), and 1I, relief not sought in their request for a preliminary injunction and, thus, not yet considered by the judge.

[14]Section 29 of St. 1993, c. 71, amended G. L. c. 69 by inserting § 1B, which provides, in pertinent part:

> "The board shall establish policies relative to the education of students in public early childhood, elementary, secondary and vocational-technical schools. . . .
>
> " . . .
>
> "The board shall provide technical assistance, curriculum, materials, consultants, support services and other services to schools and school districts . . . .
>
> " . . .
>
> "The board may withhold [S]tate and [F]ederal funds from school committees which fail to comply with the provisions of law relative to the operation of the public schools . . . .
>
> "The board shall see to it that all school committees comply with

second source, which is much more direct and compelling in its emphasis, is the Legislature's approval of the board's use of the MCAS exam, as presently structured, to implement the Act. The approvals primarily are manifested in budget line items passed by the Legislature over the years, most particularly in FY 2003 and FY 2004, appropriating substantial sums for intensive remediation programs for those who need them in order to pass the MCAS exam.[15] As the judge correctly noted, it makes no sense for the Legislature to provide for targeted remedial programs, if the Legislature did not both recognize and confirm the board's determination that passage of the English language arts and mathematics sections of the MCAS exam was to serve as the competency determination that under the Act is a prerequisite for graduation from high school. In this manner the Legislature has expressed its acceptance of the board's phasing-in approach. See *Director of the Civil Defense Agency & Office of Emergency*

---

all laws relating to the operation of the public schools . . . .

"The board shall establish the standards for the recognition of high achievement by students and school districts.

"The board shall establish the process and standards for declaring a school or school district to be 'under-performing' or 'chronically underperforming' in accordance with the provisions of this chapter.

" . . .

"The board shall carry out its responsibilities with a view toward increasing the accountability and effectiveness of public early childhood, elementary, secondary and vocational-technical schools and school districts for the performance of the students they serve.

" . . .

"The board shall establish such other policies as it deems necessary to fulfill the purposes of this chapter. . . . In accordance with the provisions of [G. L. c. 30A], the board may promulgate regulations as necessary to fulfill said purposes. Said regulations shall be promulgated so as to encourage innovation, flexibility and accountability in schools and school districts. . . ."

[15] The Legislature's approval of the board's use of the MCAS exam, as presently structured, has most recently been manifested by the enactment of St. 2003, c. 140, § 119, which directs certain changes in the performance appeals process for students with disabilities, including "children with disabilities subject to the MCAS graduation requirement in 2003."

*Preparedness* v. *Civil Serv. Comm'n,* 373 Mass. 401, 409 (1977); *Canton* v. *Bruno,* 361 Mass. 598, 607-608 (1972); *Director of the Civil Defense Agency & Office of Emergency Preparedness* v. *Leger,* 9 Mass. App. Ct. 737, 740 (1980). See also *Boston Water & Sewer Comm'n* v. *Metropolitan Dist. Comm'n,* 408 Mass. 572, 578 (1990); *Assessors of Melrose* v. *Driscoll,* 370 Mass. 443, 447 (1976).

3. What has been said above turns aside the additional arguments made by the plaintiffs and others[16] in seeking a preliminary injunction, including the contention that the Act requires that the competency of a student be measured by a variety of assessment instruments such as those mentioned in G. L. c. 69, § 1I, second par., including review of an individual student's portfolio work. Because the judge correctly determined that the plaintiffs have not shown that there is a likelihood of success on the facial challenge made, there is no need to consider the judge's determination that the plaintiffs have not shown irreparable harm in the degree needed to obtain a preliminary injunction.

4. The order denying the application for a preliminary injunction is affirmed.

*So ordered.*

IRELAND, J. (concurring). I do not disagree that our result is compelled by the procedural posture of this case and the record before the motion judge. Nonetheless, I write separately to

---

[16]We have received numerous other briefs raising a plethora of arguments. One brief, for example, argues that the regulation should be invalidated as violative of equal protection because the MCAS exam is not required of *all* children, particularly home-schooled children. Others contend that the regulation has a disparate impact on certain minority, bilingual, and special education students. While many of these contentions raise concerns regarding the implementation of the Act and question whether the remedial purpose of education reform is truly being achieved, the arguments are not properly before us and should not be addressed by us at this juncture in the procedural posture of this particular case. We consider only those arguments that focus on the issues addressed by the parties, see *Matter of the Receivership of Harvard Pilgrim Health Care, Inc.,* 434 Mass. 51, 57 (2001), leaving the other issues raised to be addressed another day.

voice my concern regarding the lack of progress in providing a sufficient education to all children educated with public funds in the ten years since this court decided *McDuffy* v. *Secretary of the Executive Office of Educ.*, 415 Mass. 545 (1993). In other contexts, I have expressed concern for the well-being of our children. See, e.g., *Barnett* v. *Lynn*, 433 Mass. 662, 667-668 (2001) (Ireland, J., concurring) (city officials should be expected to take reasonable measures to protect children when they have advance notice of danger); *Brum* v. *Dartmouth*, 428 Mass. 684, 708-710 (1999) (Ireland, J., concurring, with whom Abrams and Marshall, JJ., joined) (school officials should take steps to protect children from harm where they have advance notice of danger).

The education of our children is no less a compelling issue than their physical safety. "Local schools lie at the heart of our communities. Each morning, parents across the Commonwealth send their children off to school. They entrust the schools with nothing less than the safety and well-being of those most dear to them — their own children. No arm of government touches more closely the core of our families and our children than our schools." *Brum* v. *Dartmouth, supra* at 709 (Ireland, J., concurring).

As the court recalled, *ante* at 754 & note 5, the *McDuffy* court held that it was the constitutional "duty" of the legislative and executive branches to provide sufficient education in multiple areas "for *all* [the Commonwealth's] children, rich and poor, in every city and town." *McDuffy* v. *Secretary of the Executive Office of Educ., supra* at 606, 617-619. The *McDuffy* court left it to the Legislature (and executive branch) "to define the precise nature of the task which they face in fulfilling their constitutional duty to educate our children today, and in the future." *Id.* at 620.

Declaring that providing a "public education system of sufficient quality to all children [is] a paramount goal," the Education Reform Act of 1993 (Act), St. 1993, c. 71, amending G. L. c. 69, § 1, gave specificity to the *McDuffy* requirements. *Ante* at 754. The Act required, inter alia, curriculum frameworks, objective assessments of both students and schools, and academic standards in core subjects (mathematics, English, science and technology, history and social science, foreign languages and

the arts). G. L. c. 69, §§ 1D, 1E, 1I. *Ante* at 755. Annual assessment of the performance of both school districts and individual public schools in improving or failing to improve, inter alia, student competencies in the core subjects is required. G. L. c. 69, § 1I. *Ante* at 756.

In this case, there are many claims asserted by the plaintiffs that have yet to be tested at trial. On the record before us today, we know that (1) the current use of the Massachusetts Comprehensive Assessment System (MCAS) examination means that some core subjects have been omitted from the requisite competency determination;[1] (2) "the record is devoid of evidence about when the board plans fully to implement the Act's curriculum provisions by incorporating the remaining core subjects into the competency determination";[2] (3) "alternative routes to a high school diploma, theoretically available through a 'performance appeal' or an 'alternate assessment,' as a practical matter are closed to almost all students, particularly those with significant learning disabilities";[3] (4) there is a "considerabl[e]" disparity in pass rates for different subgroups within the Commonwealth, as well as between urban and

---

[1]As the court points out, *ante* at 759, the decision to narrow the MCAS examination to two subjects was in part due to student failure rates in 1998 and 1999: a science and technology test was administered to eighth and tenth grade students in both years, and eighth grade students were tested in history in 1999.

[2]At oral argument, the assistant attorney general admitted that there was no plan in the written record before the trial court for phasing in other core subjects. The defendants submitted to this court a memorandum from the Commissioner of Education to the members of the Board of Education, dated April 22, 2003, which states, "I recommend that Science and Technology/ Engineering not become part of the competency determination standard any earlier than the spring 2007 (Class of 2009), and that U.S. History not become part of the competency determination standard any earlier than the spring 2009 (Class of 2011). . . . Foreign languages will be included as part of the competency determination, but this is a longer-term objective." This memorandum was sent to the board after the judge's decision on the plaintiff's motion for a preliminary injunction. The assistant attorney general also agreed at oral argument that the memorandum reflected the current commissioner's thinking and did not deny that a new commissioner could change the dates of implementation of the competency determination.

[3]For example, the defendants point out that in the class of 2003, 632 students with disabilities have had alternative assessment in-depth portfolio review. Eight students have passed the English component, three have passed the mathematics portion, and one student has passed both. The defendants cite

suburban schools, and between different types of schools;[4] and (5) there is no system in place to assess the performance of the schools in core subjects not tested by the MCAS examination.[5]

The education of our children is of "crucial importance." *Brum* v. *Dartmouth supra* at 709 (Ireland, J., concurring), quoting *Care & Protection of Charles*, 399 Mass. 324, 334-335 (1987). "[T]he framers' decision to place the provisions concerning education in 'The Frame of Government' — rather than in the 'Declaration of Rights' — demonstrates that the framers conceived of education as fundamentally related to the very existence of government . . . [because] [e]ducation . . . is the means of diffusing wisdom, knowledge, and virtue, [and], therefore a prerequisite for the existence and survival of the Commonwealth." *McDuffy* v. *Secretary of the Executive Office of Educ., supra* at 565-566.

I am concerned that in the ten years since the *McDuffy* case

cost as one of the reasons that using portfolios "across-the-board . . . [is] thoroughly *im*practicable."

[4]The judge noted: "For example, the rate is 67% for limited English proficient students, 69% for students with disabilities, 75% for African-American/black students, 90% for Asian students, 70% for Hispanic students, 91% for Native American students, and 94% for white students. The competency determination rates also vary by type of school, with a rate of 86% for students in vocational/technical schools, 79% for students in urban schools and 94% for students in non-urban schools." These statistics are the department's own, from a March, 2003, progress report submitted by the defendants to the trial court.

[5]At oral argument, the assistant attorney general, in response to a question about how the schools are being assessed in the competencies not being tested, offered that "there already [were] data" in the lower grades, but that the "primary focus" has been on mathematics and English. Moreover, in the record, the defendants admit that the MCAS examination is "the primary criterion" to determine whether a school is a candidate for a panel review.

I also take note of the fact that, on November 25, 2003, for the first time, the commissioner recommended, and the board adopted, a proposal to declare two school districts (Holyoke and Winchendon) "underperforming." Two other school districts have been placed on a "watch" status (North Adams and the Joseph P. Keefe Technical School in Framingham). See 2 Systems Deemed "Underperforming," Boston Globe, Nov. 26, 2003, at B4; 2 State School Districts Called Low-Achieving, Boston Globe, Nov. 22, 2003, at A1 and B8; Romney Tackles "Civil Rights" Issue in State School, Boston Herald, Nov. 25, 2003, at 4. Winchendon and Holyoke were two of the school districts considered in the *McDuffy* case. *McDuffy* v. *Secretary of the Executive Office of Educ.*, 415 Mass. 545, 545 n.1 (1993).

was decided and the Legislature declared education of our children to be a "paramount goal," St. 1993, c. 71, § 27, progress toward providing education in all core subjects to all the Commonwealth's students educated with public funds, disabled and nondisabled, rich and poor, and of every race and ethnicity, has not advanced more. Schools are not being assessed on their performance in teaching core subjects beyond English and mathematics. In the best of circumstances, it will be 2009 before four of the five core subjects will become part of the assessment, sixteen years after the 1993 *McDuffy* decision and the 1993 Act.[6] See note 2, *supra*. The availability of the competency determinations as an assessment instrument is only the first step in remedying poor school performance. How long it will take poorly performing schools or school districts to then be identified and reviewed, and measures to be taken to make them accountable for the education of their students, is unknown.[7] These delays do not seem to be in keeping with *McDuffy* mandates or the Act, both of which addressed a "state of emergency" in the Massachusetts education system identified in *1991* by the board itself. *McDuffy* v. *Secretary of the Executive Office of Educ.*, *supra* at 552.

---

[6]From the 1998 and 1999 failure rates of students taking science and technology and history sections of the MCAS examination, see note 1, *supra*, one may speculate that students are not being properly educated in those subjects. Moreover, the defendants point out that until there is testing that holds students accountable, many students are not motivated to apply themselves.

[7]As noted, see note 5, *supra*, ten years after the *McDuffy* case and the Act, Winchendon and Holyoke have been identified as underperforming school districts. This determination has triggered a process of gathering data and drawing up plans for improvement. The schools are being given two to three years to improve or face State takeover. I point this out, not as criticism of the process, but merely to emphasize the amount of time the process takes.