Kaplan, Mitchell H., J.
Plaintiff, Athenahealth, Inc. (Athena) filed this action seeking to enforce a restrictive covenant contained in an employment agreement with its former employee, defendant Thomas F. Cady. The complaint asserts tort and statutory claims against Cady and his new employer, defendant Care-Cloud Corporation (CareCloud). The case is before the *347 court on Athena’s motion for a preliminary injunction. For the reasons that follow, Athena’s motion is denied.
BACKGROUND
“By definition, a preliminary injunction must be granted or denied after an abbreviated presentation of the facts and the law.” Packaging Indus. Group, Inc. v. Cheney, 380 Mass. 609, 616 (1980). The court bases the following factual statement on the preliminary injunction record, which consists of the complaint, affidavits from both parties and the exhibits attached to them, and the reasonable inferences that it draws from the record evidence.
Athena is an information technology company that designs and provides electronic health record, practice management, and care coordination services to physician practices and health systems. It designs systems that allow physicians to store, access, and use medical records for clinical, billing, and management purposes. Unlike the majority of Athena’s competitors, Athena’s services are “cloud-based,” meaning that its applications and services are delivered over the Internet, rather than accessed through software installed by the client. CareCloud is one of Athena’s few direct competitors that is also cloud-based.
Athena counts as one of its key competitive advantages its “Professional Services,” which Athena defines as the methods that Athena uses to configure and implement its products for small, medium, large, and enterprise clients so that they can “go live” on Athena’s services as quickly as possible. This set of approaches shortens the implementation cycle, manages implementation costs, and improves customer experience.[1] Athena pre-configures its services for each client, and then tracks and optimizes their use after implementation. The coordination and sequencing of multiple discrete tasks in a precise order constitute the detailed blueprint of Athena’s client implementation model that Athena contends is a trade secret.[2]
Prior to his employment at Athena, Cady spent eighteen years at IDX Corporation, a company that developed software and solutions for healthcare systems and group practices, where he implemented revenue cycle management systems for medical groups around the country. He began his career at Athena as a Regional Vice President of Sales for the Northeast region in 2002; in that position he focused exclusively on sales. At the outset of Cady’s employment with Athena he signed an employment agreement. The agreement stated that Cady will serve in his present position, or in such other positions as he may be assigned. As a part of that agreement, Cady agreed not to disclose any confidential information, broadly defined in the agreement, and not to “render any services in any capacity to any person or entity engaged in any business competitive with [Athena]” for a period of one year following termination of his employment in the United States and Canada (the non-compete agreement). The employment agreement contained an integration clause that stated that it could not be modified except by a writing signed by the parties, “provided however that compensation levels may be adjusted by assent of the parties” and the employee’s assent will be established by his “acceptance ... of compensation at such adjusted level.”
In March 2007, Cady’s position with Athena changed. Athena made him Vice President of Professional Services leading teams responsible for assisting customers with the implementation process. In this position, Cady was no longer responsible for sales, nor did he have contact with the customers; he also reported to a different person. Notably, his compensation was reduced by about twenty-five percent.[3] At the time of this new assignment, Cady was given a one-page “Offer of Employment” form which he signed (the form). It set out his new title and his new compensation and benefits, and confirmed that he was an at-will employee. The form made no reference to his employment agreement or to the non-disclosure and non-competition covenants contained in it.
In 2012, Athena adopted a new stock option plan granting stock options based on a percentage of salary, rather than on performance and job level. As a result, Athena eliminated Cady’s opportunity to earn about seventy-five percent of the options that he had previously been receiving. In the fall of 2012 Cady, concerned about his reduced compensation and increased family expenses, asked for the opportunity to be promoted to a Senior Vice President position. He explained that, absent that possibility, financial considerations might force him to seek alternative employment. Meetings with Athena’s Chief Executive Officer, Jonathan Bush, and Chief Operating Officer, Edward Park, did not resolve the issue: Athena offered Cady a new role with the company but Cady declined the offer because he believed that it lacked an opportunity for upward mobility and financial incentives.
On December 13, 2012, at one of his monthly company-wide meetings with employees (the December 13 meeting), Bush discussed CareCloud and its competition with Athena. He addressed the issue of employees leaving Athena to work for CareCloud stating, inter alia, as follows;
I think that. . . it’s a form of flattery to be copied. It’s flattering to have people, . .. colleagues wanted badly by other companies. And it means that we are who we are because we want to be . . . we’re here because we want to be, not because we couldn’t go get a similar job somewhere else ... I believe that this is evidence that our decision ... to make the culture of the place the most valuable asset is a wise one, because people can leave, and code becomes obsolete, and healthcare rules can change, but the feeling you get when you’re here, like this, with us, you need us for . . . So, we are not going to do anything about anyone who leaves, anybody else who wants to go, you know, you’re allowed. There’s *348 no team... the Allscripts legal team will not be after you to sue you. You have non-competes . . . Don’t take your . . . You have a non-compete, you can’t take your sales prospects list that we spent $500,000 collecting and then go over and give it to the other team.[4]
Although Cady was working offsite at the time Bush delivered these remarks, upon his return to the office he listened to the recording of the meeting which was posted on Athena’s internal website.
In January 2003, Cady’s work load increased when the person to whom he reported was reassigned, and he assumed some of her job responsibilities while a search for her replacement was undertaken, but his compensation did not increase. At his annual review in February, Cady received only a standard raise. Cady tendered his resignation to Park on March 6, 2013, and informed Park that he had accepted a position at CareCloud. He returned all Athena’s property and asserted that he did not remove any files or information from his office at Athena. While Athena alleges that Cady could have done so, it offers no evidence that he did. On March 18, 2013, Cadyjoined CareCloud as Vice President of Professional Services, a position substantially similar to that which he held at Athena.
This action followed. In its complaint, Athena asserts claims for breach of contract against Cady (Count I); tortious interference with contractual relations against CareCloud (Count II); misappropriation of trade secrets against Cady and CareCloud (Count III); and violation of G.L.c. 93A against CareCloud. Athena now moves (1) to enforce Cady’s covenant not to compete and to enjoin Cady from working for Care-Cloud; (2) to order Cady to return any and all confidential and proprietary documents in his possession; and (3) to restrain Cady and CareCloud from disclosing or using any Athena trade secrets in Cady’s possession. The defendants contend that: (1) Bush’s statements at the December 13 meeting relieved Cady of any contractual obligation not to work for CareC-loud as long as he did not reveal trade secrets; (2) material changes in Cady’s employment vitiated any restrictive covenants; and (3) in any event, Cady’s position with CareCloud does not pose a threat to any legitimate business interests that Athena may protect by enforcement of a covenant not to compete, because it does not require Cady to use or disclose and confidential information that he may have acquired.
DISCUSSION
Injunctive relief “is an extraordinary remedy never awarded as a matter of right.” Winter v. Natural Resources Defense Council, Inc., 555 U.S. 7, 24 (2008). Under the well established balancing test articulated in Packaging Indus. Group, Inc., 380 Mass, at 617, a preliminary injunction is warranted only when the moving party establishes both a likelihood of success on the merits of its claim(s), and a substantial risk of irreparable harm in the absence of an injunction.
Once these elements are established, the court must balance the threatened harm to the moving party against the harm that an injunction will inflict on the opposing party. Id. In balancing those considerations, “(w]hat matters as to each party is not the raw amount of irreparable harm the party might conceivably suffer, but rather the risk of such harm in light of the party’s chance of success on the merits.” Id. “Only where the balance between these risks cuts in favor of the moving party may a preliminary injunction properly issue. ” Id. “[T]he significant remedy of a preliminary injunction should not be granted unless the plaintiff! 1 ha[s] made a clear showing of entitlement thereto.” Student No. 9 v. Board of Educ., 440 Mass. 752, 762 (2004). See also Landry v. Attorney General, 429 Mass. 336, 343 (1999) (remedy of a preliminary injunction “should not be grant[ed] unless [the plaintiffs] by a clear showing, carrie[d their] burden of persuasion”).
“Employee covenants not to compete generally are enforceable only to the extent that they are necessary to protect the legitimate business interests of the employer.” Marine Contractors v. Hurley, 365 Mass. 280, 287 (1974). Legitimate business interests might include trade secrets, confidential information, or the good will the employee has acquired through dealings with his customers. Id. See also All Stainless, Inc. v. Colby, 364 Mass. 773, 779-80 (1974). Here, Athena claims as its legitimate business interests trade secrets and confidential information, including what it contends is its unique Professional Services model, described supra, as well as strategic plans for future process and technological improvements in service implementation, specifically with respect to remote and self-service implementation. Athena also points to its corporate strategy information, such as its “sales funnel,” see n. 2, supra, and its financial plans and budgets as trade secrets it contends Cady would inevitably disclose in his employment with CareCloud.
I. Likelihood of Success on the Merits
A. Breach of Contract (Count I)
“A covenant not to compete contained in a contract for personal services will be enforced if it is reasonable, based on all the circumstances.” All Stainless, 364 Mass, at 778, and cases cited. The Court will consider, inter alia, “the reasonable needs of the former employer for protection against harmful conduct of the former employee ...” Id. ‘The former employee must be in a position where he can harm that good will, perhaps . . . because of his knowledge of some business secret or confidential information...” Id. at 779.
Athena argues that Cady breached the covenant not to compete included in his employment agreement when he went to work for CareCloud. It notes that Cady has, in essence, the same position at CareCloud as at Athena and, under the reasoning set out in Marcam Corp. v. Orchard, 885 F.Sup. 294, 297 (D.Mass. 1995), he would inevitably use Athena’s confidential, proprietary, or trade secret information.
*349 The court finds that, on the record before it, there is significant doubt as to whether Athena’s claimed trade secrets qualify as such and whether Cady is so familiar with them that he would inevitably use them in his work with CareCloud. The burden is on the plaintiff to “show that the information constitutes a trade secret.” Harvard Apparatus Inc. v. Cowen, 130 F.Sup.2d 161, 174 (D.Mass. 2001) (applying Massachusetts law). See also Data Gen. Corp. v. Grumman Sys. Corp., 825 F.Sup. 340, 357 (D.Mass. 1993) (applying Massachusetts law) (a plaintiff “must identify the trade secrets and cany the burden of showing that they exist”). “A trade secret may consist of any formula, pattern, device or compilation of information which is used in one’s business, and which [provides] an opportunity to obtain an advantage over competitors who do not know or use it. . . The subject matter of a trade secret must be secret. Matters of public knowledge or of general knowledge in an industry cannot be appropriated by one as his secret.” J.T. Healy & Son, Inc. v. James A. Murphy & Son, Inc., 357 Mass. 728, 736 (1970).
The existence of a trade secret depends on the facts of each case. Jet Spray Cooler, Inc. v. Crompton, 361 Mass. 835, 840 (1972). “A trade secret can exist in a combination of characteristics and components, each of which, by itself, is in the public domain, but the unified process, design and operation of which, in unique combination, afford a competitive advantage and is a protectable secret.” Sutra, Inc. v. Iceland Express, 2008 U.S. Dist. LEXIS 52849, at *11 (July 10, 2008) (applying Massachusetts law) (internal quotations and citations omitted). The claimed trade secret must include “some aspect that is valuable and not known to the particular trade.” Id. See also Data Gen. Corp., 825 F.Sup. at 357.[5]
In his supplemental affidavit, Kevin Scheper asserts that the critical trade secret in this case is Athena’s proprietary client implementation tasks: over 500 discrete tasks that are “deliberately coordinated and sequenced in a very precise order in order to minimize bottlenecks and maximize the efficient use of resources.”[6] Exhibit 1 to his affidavit contains a project plan, a sequential list of those tasks divided into four phases. Athena argues that, over the years during which the implementation tasks were identified and developed, Cady became familiar with their precise order, i.e., the sequence of those tasks. He also would have become knowledgeable concerning inherent weaknesses in Athena’s approach that he could somehow exploit in competing for new business.
Cady counters in his supplemental affidavit that such project planning is not a novel concept when implementing systems and, therefore, is not confidential information. He states that prior to arriving at Athena he had many years experience in systems implementation and support. Attached to Cady’s affidavit is a sample CareCloud project plan, not considered confidential, which lists implementation tasks, many of which are similar to those listed by Athena.
The court can infer that Athena’s system implementation may be geared specifically to both its product and the needs of a particular customer, but that does not necessarily mean that it is protected information. To the contrary, CareCloud would be likely to, and claims it did, devise its own system implementation, geared to its own customers; its project plan bears out this inference. The court is also not persuaded that Cady’s knowledge of the sequencing of tasks, such as it is, is relevant to his employment at CareCloud. The evidence supports a conclusion that Cady’s primary responsibility will be team leadership and staff development. He is not a software developer or engineer. Albert Santolo, Chairman, President and CEO of Care-Cloud asserts in his affidavit that he hired Cady for his strong leadership skills and ability to develop, oversee, and manage the teams that deliver the implementation of CareCloud’s services.[7],[8] For the purposes of the present motion, the court considers that Cady’s knowledge and experience in working with implementation teams to be skills in the nature of ordinary competition, not something that should be considered a legitimate business interest. See, e.g., Marine Contractors, 365 Mass, at 287-88.
In this regard, Athena’s reliance on Marcam is inapposite. In Marcam, the defendant employee was Marcam’s Director of Development and later the Vice-President of Development directly responsible for the development and marketing of Marcam’s proprietary software, PRISM. Id. at 296. He managed the budget for the development committee, was involved in Marcam’s sales efforts with respect to PRISM, and was privy to top-level discussions concerning Marcam’s research and development efforts regarding its current and future products. Id. When the defendant moved to a direct competitor, Datalogic, the court concluded that the his intimate knowledge of all aspects of Marcam’s products and operations, would inevitably, if inadvertently, influence what he did for Datalogic, in spite of the defendant’s claim that his knowledge was not transferable. Id. at 297.
In Marcam the Federal District Court relied on the reasoning of an earlier case, Bard v. Intoccia, 1994 WL 601944 (D.Mass. 1994), in support of its decision. In that case, like Marcam the individual defendant who the plaintiff sought to enjoin from working for a competitor was the project manager responsible for developing the very product, including a marketing strategy, that he was hired to develop for his new employer. Indeed, the court inferred that the individual defendant was hired to fill a knowledge void concerning the product at the competitor firm.
By contrast, Cady was not an engineer responsible for developing software at Athena or other technical solutions. He was not responsible for a marketing strategy and had no contact with customers or poten *350 tial customers. Rather, Cady began in sales and[ five years later moved to managing teams of individuals responsible for implementing the Athena system. Based on the record before it, the court is not convinced that Cady is in possession of the kind of highly confidential technical and marketing information as the defendant project managers in Marcam and Bard such that he would, of necessity, inevitably disclose that confidential information in the course of his work for CareCIoud. To the extent that Cady has learned about the types of problems that are encountered in implementing medical record systems at physician practices and methods of approaching them, he has the right to use that general skill, knowledge, and experience for other employers, including Athena’s competitors. See, e.g., J.T. Healy & v. James A. Murphy & Son, Inc., 357 Mass. 728, 740 (1970).
Finally, although neither party has directed the court to applicable case law (nor has the court found any), the court cannot disregard Bush’s statements at the December 13 meeting. Athena argues that Bush’s comments are merely rhetoric and contradictory to his written script, which was posted with a recording of his presentation to the employees, and the written script must control. According to Athena, Bush never intended to relinquish Athena’s contractual rights to enforce its restrictive covenants and, indeed, his statements can be construed to mean that Athena would initiate litigation to protect its business interests.
The court has watched the video and read the transcript; it cannot come to the same conclusion as Athena. The court finds that a reasonable employee, certainly one who was not a lawyer, would have interpreted Bush’s comments to mean that Athena counts as its “most valuable” asset its culture, a culture in which its most valued employees will wish to stay because of, as Bush puts it, “the connective tissue,” which binds the enterprise. If that is not enough for an employee, “people can leave.” Athena will not use teams of lawyers enforcing non-competes to keep them. The so-called “written script” notes that some employees sign employment agreements that contain “in some cases non-compete provisions. We work with former employees and companies like CareCIoud to ensure those agreements are not violated.” While a cautious lawyer might see an inconsistency between this last, brief sentence and Bush’s express statement that if you don’t want to work at Athena, you can go to work at CareCIoud, just don’t take any confidential information with you, it is not at all clear that a non-lawyer would draw that conclusion. The written script does not say: Bush’s remarks will not apply to any employee who has a non-compete; as to you legal teams will “sue you.” Indeed, if an employee did not have a non-compete provision in his/her employment agreement, Athena would have no basis to object to that employee accepting employment with CareCIoud, or any other competitor, and Bush’s statements would be meaningless.
Indeed, Bush’s comments specifically refer to Care-Cloud and specifically mention those employees with non-competes who already have, or might in the future, leave Athena for CareCIoud. While in hindsight Bush’s comments may have been ill advised, that does not change what he said. A reasonable employee such as Cady, having seen or heard Bush’s remarks, could conclude that he would not be prevented from going to CareCIoud, even if his employment agreement contains a non-compete provision.[9] While, Bush’s comments may not constitute an amendment to Cady’s employment agreement, they must certainly be taken into consideration in determining whether the court should order extraordinary equitable relief depriving Cady of his employment.
Cady also makes an argument that material changes in his employment in 2007 and 2012 had the effect of vitiating the non-compete provision of his employment agreement under the rule originally announced in F.A. Bartlett Tree Experts v. Barrington, 353 Mass 585, 587-88 (1968). Many cases in which changes in compensation or duties were important considerations in a court’s decision regarding the enforcement of covenants not to compete involved circumstances in which an employee was presented with a new employment agreement which, in some instances, the employee refused to sign, as was the case in Bartlett. See, e.g., Iron Mountain Information Mgmt., Inc. v. Taddeo, 455 F.Sup.2d 124, 132 (E.D.N.Y. 2006) (applying Massachusetts law); Lycos, Inc. v. Jackson, 18 Mass. L. Rptr. 256, 2004 Mass.Super. LEXIS 348, at *9 (Mass.Super.Ct. August 25, 2004) (Houston, J.); Cypress Group, Inc. v. Stride & Assocs., Inc., 17 Mass. L. Rptr. 436, 2004 WL 616302 (Mass.Super.Ct. February 11, 2004) (Burnes, J.); Intertek Testing Seros. N.A., Inc. v. Curtis Strauss, LLC, 2000 WL 1473126 at *6 (Mass.Super.Ct. August 8, 2000) (Gants, J.); Grace Hunt IT Solutions, LLC v. SIS Software, LLC, Suffolk Civ. No. 12-0800-BLS1 (Lauriat, J.) [29 Mass. L. Rptr. 460]; AFC Cable Sys., Inc. v. Clisham, 62 F.Sup.2d 167, 173 (D.Mass. 1999) (applying Massachusetts law). At the time of the hearing on this motion for preliminary relief, the parties were apparently unaware that Cady had been given the one-page employment form to sign in 2007, when his duties changed and his compensation was significantly reduced. By signing that form, Cady accepted his new position and compensation. The form, however, makes no reference to the 2002 employment agreement; for example, by directing Cady’s attention to it and reminding him of the non-compete or reciting that all other terms of the employment agreement continue in force.
In the end, whether there has been “a modification of a previous agreement, rather than an implied revocation or termination of the agreement as the result of such a subsequent change, depends upon the intention of the parties.” Astro-Med v. Nihon Kohden of America, 591 F.3d 1, 17 (1st Cir. 2009). See also *351 ■ Intertek Testing Servs. N.A., Inc. v. Curtis Strauss, LLC, 2000 WL 1473126 at *6 (Mass.Super.Ct. August 8, 2000) (Gants, J.). The court finds that the parties likely intended a modification not a revocation, as evidenced by Cady’s conduct in discussing his employment agreement, including the non-compete, with CareC-loud during the interview process. Were the non-compete otherwise enforceable against Cady, the change in the terms of his employment would not be enough to cause this court to deny preliminary injunctive relief. However, likelihood of success on the merits is a spectrum to be considered in the context of the risk and extent of harm established if an injunction does not issue, and the change in Cady’s terms of employment, including his loss of the opportunity to earn options in 2012, is an element to be taken into consideration.
B. Tortious Interference with Contractual Relations (Count II)
To make out a successful claim, Athena must prove that (1) it had a contractual relationship with Cady; (2) CareCloud knowingly induced a breaking of the relationship; (3) CareCloud’s interference with the relationship, in addition to being intentional, was improper in motive or means; and (4) Athena suffered harm as a result. United Truck Leasing Corp. v. Gelt-man, 406 Mass. 811, 816-17 (1990). As the court has already concluded, Athena has not made a strong showing of likelihood of success on the merits of its breach of contract claim. Obviously, its claim for intentional interference with contractual relations can fare no better. Moreover, there is no evidence in the record that CareCloud improperly solicited or recruited Cady or took other actions such that any interference on the part of CareCloud, even if intentional, was improper in motive or means. See, e.g., Blackstone v. Cashman, 448 Mass. 255, 260 (2007).
C. Misappropriation of Trade Secrets (Count III)
To succeed on a claim for misappropriation of trade secrets, a plaintiff must prove that (1) the plaintiff possesses a trade secret; (2) the plaintiff took reasonable steps to preserve the secrecy of the trade secret; and (3) the defendant breached the duly not to disclose or to use the trade secret. Peggy Lawton Kitchens, Inc. v. Hogan, 18 Mass.App.Ct. 937, 939 (1984). “The essence of an action for the wrongful use of trade secrets is the breach of the duty not to disclose or to use without permission confidential information acquired from another.” Jet Spray Cooler, Inc. v. Cramp-ton, 377 Mass. 159, 165 (1979). “As an initial element of the cause of action, the plaintiff must show that the information constitutes a trade secret.” Harvard Apparatus Inc. v. Cowen, 130 F.Sup.2d 161, 174 (D.Mass. 2001) (applying Massachusetts law). See also Data Gen. Corp., 825 F.Sup. at 357 (a plaintiff “who seeks relief for misappropriation of trade secrets must identify the trade secrets and carry the burden of showing that they exist”). Again, Athena has not made a substantial showing that Cady has disclosed or inevitably will disclose trade secrets or other confidential information.
II. Irreparable Harm
As noted above, likelihood of success on the merits must be considered in the context of the harm that a plaintiff will suffer if an injunction does not issue, as compared to the harm the defendant will suffer if enjoined. It is, of course, the plaintiffs burden to present evidence of immediate and irreparable harm. See, e.g., Carroll v. Marzilli, 75 Mass.App.Ct. 550 (2009) “[a]s private parties seeking a preliminary injunction ... the plaintiffs must show immediate irreparable harm”). See also Town of Burlington v. Department of Educ. of Mass., 655 F.2d 428, 432 (1st Cir.1981) (party seeking preliminary injunction must show danger of immediate, irreparable injury).
In this case, Athena has not established that Cady has disclosed trade secrets or, in this court’s view, that he will inevitably disclose them if he works for CareC-loud as Vice President of Professional Services. Unlike the individual defendants in Marcam and Bard, Cady is not an engineer with product development skills. Moreover, the Santalo affidavit adequately demonstrates that CareCloud is not in a product development phase like the defendant companies in those cases, but rather a technology company that has entered the market with its own products. Indeed, two years ago when CareCloud was raising venture capital investments, Santolo met with Bush who commented on the “beauty” of CareCloud’s technology.
Cady also has not been directly involved in sales for Athena since 2007, so he is not possessed of Athena good will or contacts that he could use for CareCloud’s benefit and to Athena’s detriment. While Cady might have been exposed to Athena’s prospect list, he would have had no reason to focus or internalize it, as his job did not involve customer contact or supervision of sales personnel. There is also no evidence that the universe of potential customers for both companies is not something that can be derived from public sources. The Athena affidavits make reference to three large potential customers with which it has been working. Cady responds that these are not the type of customer on which CareCloud is now focused. Nonetheless, Cady will be enjoined from identifying these potential customers to CareCloud, and if CareCloud independently identifies them as prospects, Cady shall be walled-off from having anything to do with CareCloud’s efforts to solicit them or implement its products for their use.
Finally, while Athena’s potential for immediate and irreparable harm is not well established in the record, the likelihood of harm to Cady if an injunction were to issue appears significant. Certainly, given Bush’s comments concerning his desire only to employ individuals who value Athena’s culture and his invitation to others to leave, his prospects at Athena were he to *352 stay would not be encouraging. There is no evidence that CareCloud would have a position for Cady that would alleviate Athena’s concerns, especially since the position in which he will be working, like Cady’s position at Athena, does not focus on product development, marketing strategy or sales.
CONCLUSION AND ORDER
For the forgoing reasons, it is ORDERED that Plaintiff Athenahealth, Inc.’s Motion for Preliminary Injunction is DENIED; provided, however, that Defendant, Cady shall not disclose the identity of the three companies referred to in the Scheper Affidavit to anyone at CareCloud and should those firms be independently identified, Cady is ordered not to have any involvement in efforts to retain them as customers or implement CareCloud’s products for their use for a period of one year from the date of this order.

 Athena asserts that it has reduced the implementation process from about five months to 6-11 weeks. Athena has also developed remote implementation systems that reduce the costs of integrating its services into a customer’s office workflow, thus giving Athena strong competitive advantage in pricing. In addition, Athena provides “self-service” implementation for small practices which eliminates the need for on-site assistance and reduces the costs of setting up new customers.

In addition, Athena continues to develop strategic plans for future processes and technological improvements to its service implementation. It also identifies its “sales funnel,” that is those customers that are in its sales pipeline and those that it intends to target in the future, as well as sales strategies directed at those customers.

In his sales position, Cady made between $225,000 and $250,000 with the potential, depending on various quota targets, of making $350,000. As Vice President of Professional Services, he made $190,000 with a maximum earning potential of $210,000.

There is some dispute as to the punctuation in this excerpt. Cady contends that the phrases “you have non-competes” is followed by a question mark, while Athena argues otherwise. This is a distinction without a material difference. According to Athena Allscripts is a competitor of Athena that has been particularly aggressive in enforcing non-competes, and therefore the quote was not intended to refer to Athena’s legal team. However, in context, the Allscripts reference seems clear: At Athena we will keep our employees by having a business and culture such that “the really good people will want to be at it, . . . then the really good people won’t want to be there as much as they want to be here,” not by enforcing covenants not to compete.

See also Charles Tait Graves & Brian D. Range, Identifications of Trade Secret Claims in Litigation: Solutions for a Ubiquitous Dispute, 5 Nw.J.Tech.&Intell.Prop. 68, 69 (2006), and cases cited.

Cady claims that the lists are duplicative, and that there are only 160 discrete tasks described.

To the extent that Athena argues that Cady is in possession of information regarding ways for Athena to reduce implementation times, Cady and CareCloud assert that CareCloud’s implementation times are already shorter than Athena’s, and this information would be of little use to CareCloud.

CareCloud asserts, and Athena does not dispute, that CareCloud investigated the restrictions in Cady’s employment agreement with Athena, and instructed Cady that he must not use any confidential or proprietary information belonging to a previous employer.

Athena notes that Cady’s affidavits do not expressly state that he began employment discussions with CareCloud only after listening to Bush’s comments and specifically relied on those comments in deciding that he was not bound by his non-compete. Perhaps, although the chronology certainly suggests that Bush’s comments preceded his decision to accept employment with CareCloud and give his termination notice to Athena. Additionally, CareCloud’s CEO attests that Cady informed him of Bush’s comments before he decided to hire Cady and it played a role in his conclusion that Athena would not seek to enforce the covenant preventing Cady from working for CareCloud. It is possible that at trial different evidence could be adduced, but at the preliminary injunction stage of this litigation it appears that the defendants could reasonably take those Bush comments into consideration in choosing a course of action.