Sanders, Janet L., J.
This action arises from a decision by the Massachusetts Gaming Commission (the Commission) to award a license to Wynn MA, LLC (Wynn) to operate a casino in Everett. As part of that process, the Commission determined that the City of Boston was not a “host community” under the Massachusetts Expanded Gaming Act (the Gaming Act), then “dedesignated” Boston as a “surrounding community” when the City refused to participate in arbitration. In a wide-ranging complaint, 153 pages long, Boston alleges numerous acts of wrongdoing by the Commission that date back to the earliest phase of the licensing process, attacking not only the licensing decision but also the Commission’s determination that Wynn was a suitable candidate to begin with. The relief that Boston seeks is also comprehensive: it asks this Court not only to vacate the Commission’s determination about Boston’s host community status but also to set aside the award to Wynn and to disqualify all Commission members from future proceedings.
Now before the Court is the Commission’s Motion to Dismiss Boston’s Amended Complaint pursuant to Mass.R.Civ.P. 12(b)(6) and 12(b)(1). The Commission makes many legal arguments in support of its Motion, among them that the complaint was filed too late and that the Gaming Act itself precludes any judicial review. Although unpersuaded by these arguments, this Court nevertheless concludes that the Motion must be Allowed. Boston has standing to make a legal challenge only to the extent that it has suffered an injury that falls within the “zone of interests” protected by the Gaming Act, and that injury is limited to the host communiiy/surrounding community decisions of the Commission. As to that legal challenge (and assuming all allegations in the Complaint to be true), this Court concludes that the Commission correctly applied the Gaming Act and enforced regulations validly promulgated thereunder. Finally, the count *248 that seeks to disqualify all commissioners contains only legal conclusions and broad generalities, and is not supported by factual allegations sufficient to “raise a right to relief above the speculative level." Iannachino v. Ford Motor Co., 451 Mass. 623, 636 (2008), quoting Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 557 (2007). Accordingly, as to those counts for which it has standing, the City of Boston has failed to state a claim upon which relief may be granted.
BACKGROUND
In reaching the conclusion that it does, this Court has applied the Gaming Act and its regulations to the allegations set forth in Boston’s Amended Complaint (the Complaint). It has not been an easy task. There is no judicial precedent for interpreting the Gaming Act, given its recent vintage. As to the Complaint, it is peppered with adjectives and adverbs, characterizing the Commission’s proceedings as “corrupt,” and a “costly charade,” its decisions the result of “machinations,” “predetermined outcomes,” and “mock” hearings. These inflammatory descriptions tend only to obscure the factual allegations, which this Court must assume to be true for purposes of this Motion.
The Gaming Act and its Regulations
In a separate decision issued this same date, this Court provided a comprehensive description of the Gaming Act, which it incorporates here by reference. Revere v. Massachusetts Gaming Comm’n, SUCV2014-3253-BLS 2 [33 Mass. L. Rptr. XXX). Certain sections of the Act are of particular relevance to Boston’s claims. They are as follows.
The Gaming Act was enacted in 2011 and codified at G.L.c. 23K. It is administered by the Commission, which consists of five Commissioners appointed by the Governor, Attorney General, and the Treasurer. They are required by statute to have some expertise in criminal investigation and law enforcement, corporate finance and securities, and legal and policy issues. G.L.c. 23K, §3(a). As stated in G.L.c. 23K, §1, “the power and authority of the commission shall be construed as broadly as necessary for the implementation, administration and enforcement” of the Gaming Act. See also G.L.c. 23K, §4 (the Commission “shall have all powers necessary or convenient to carry out and effectuate its [the Act’s] purposes”). The Commissioners are subject to strict statutory ethical standards, the state conflict of interest law (Chapter 268A), and an enhanced code of ethics, G.L.c. 23K, §3(m), (u).
The Gaming Act authorizes the Commission to award three licenses to operate casinos with gaming tables and slot machines (the Category 1 Licenses) in each of three regions of the Commonwealth (Regions A, B, and C). G.L.c. 23K, §19(a). Region A includes Suffolk, Middlesex, Essex, Norfolk, and Worcester Counties. Id. This lawsuit concerns the award to Wynn of a Category 1 License for Region A.
The Gaming Act and its regulations establish a two-phase application process for Category 1 Licenses. G.L.c. 23K, §12; 205 C.M.R. §110.01. The first phase is known as the “Request for Application Phase 1" (RFA-1), and begins when the Commission receives a Phase I application from each applicant that must make several disclosures. 205 C.M.R. §111.00 et seq. In this phase, the Commission determines whether an applicant is ’’suitable" for a license following an investigation conducted by the Investigations and Enforcement Bureau (IEB), a law enforcement agency within the Commission. G.L.c. 23K, §12(a); 205 C.M.R. § 115.03-05. When evaluating suitability, the Commission must assess the overall reputation of the applicant, considering among other things the applicant’s integrity, honesty, and good character. G.L.c. 23K, § 12(a). The Commission must deny a gaming license application if the applicant: a) has been convicted of a felony or other crime involving embezzlement, theft, fraud or perjury; b) has submitted a false or misleading application; c) has engaged in a pattern of misconduct that makes the applicant unsuitable for a license; or d) has affiliates or close associates that would not qualify for a license or whose relationship with the applicant could be injurious to the Commonwealth’s interests. G.L.c. 23K, §16(a). These same factors apply equally to any entity or individual “with a financial interest in the business of the gaming licensee or applicant for a gaming license or who is a close associate of a gaming licensee.” G.L.c. 23K, §14(a). If these other entities or persons with such an interest are themselves unsuitable, then the applicant is not suitable either. Id.
Only those applicants found to be suitable may proceed to the second phase, known as the “Request for Application Phase 2" (RFA-2). See 205 C.M.R. § 110.01 (2). In RFA-2, the applicant submits another application that focuses on the site, design, operation and other attributes of the gaming establishment, including the mitigation of adverse impacts. Among other things, a completed RFA-2 application must contain a copy of a ’’host community" agreement as well as a certificate showing that the host community voted in favor of the license in a referendum. 205 C.M.R §119.01(4), (7); G.L.c. 23K, §15(8), (13). A “host community” is defined as “a municipality in which a gaming establishment is located or in which an applicant has proposed locating a gaming establishment.” G.L.c. 23K, §2. That same provision of the Gaming Act defines a “gaming establishment” to include not only the areas of the premises where gaming is conducted but also “any other nongaming structure related to the gaming area [which] may include, but shall not be limited to, hotels, restaurants or other amenities.” Id. A host community agreement sets forth the community impact fee that will be paid to the host community and the mitigation measures planned to minimize negative impacts from the development and operation of the proposed gaming establishment. G.L.c. 23K, §15(8).
*249 The RFA-2 application must also include copies of any “surrounding community” agreements the applicant entered into prior to submission. 205 C.M.R. §119.01(8). “Surrounding communities” are defined as “municipalities in close proximity to a host community which the commission determines experience or are likely to experience impacts from which the transportation infrastructure provides ready access to an existing proposed gaming establishment.” G.L.c. 23K, §2. Unlike host communities, surrounding communities are not entitled to vote for or against the casino by way of a referendum. They are nevertheless entitled to mitigation of the casino’s potential negative impacts; those mitigation measures are expressed in the agreements that the surrounding communities enter into with the license applicant. G.L.c. 23K, §15(9).
As part of the RFA-2 process, the Commission must determine the location of the “gaming establishment,” which in turn determines which municipality is a “host community” under the Gaming Act. The Commission is also responsible for formally designating which municipalities are “surrounding communities.” Those municipalities that have already entered into surrounding community agreements with the license applicant are automatically designated as such. G.L.c. 23K, § 17(a). Those that have not entered into such agreements can petition the Commission for surrounding community status. 205 C.M.R §125.01(2). If the Commission determines that a municipality is a surrounding community, the applicant must negotiate a signed agreement with that municipality within 30 days of the determination. G.L.c. 23K, §17(a). If no agreement is reached by the 30-day deadline, the Commission’s regulations require the applicant and the municipality to enter into arbitration where a panel chooses between competing “best and final offers” given by the applicant and affected municipality. See 205 C.M.R. §125.01 (6)(b), (c). Where a municipality refuses to participate in the arbitration process, the Commission may, pursuant to a regulation that it enacted, find that the municipality has waived its designation as a surrounding community. 205 C.M.R. § 125.01 (6) (a) (2).
When considering the merits of an RFA-2 application and deciding who among the competing applicants should receive a gaming license, the Commission considers whether the applicant satisfies sixteen minimum requirements for a license and whether it advances nineteen other objectives. G.L.c. 23K, §§15, 18. These objectives include “promoting local businesses,” “budding a gaming establishment of high caliber with a variety of quality amenities,” “providing a high number of quality jobs,” and “gaming support of the host and surrounding communities.” G.L.c. 23K, §18(2), (5), (12), (19). The Commission has “full discretion as to whether to issue a license.” G.L.c. 23K, §17(g). An applicant “shall not be entitled to any further review if denied by the commission.” Id. See also 205 C.M.R. §102.07 and St. 2011, c. 194, Preamble.
Award of the Region A Category 1 License
As to how the Commission came to award Wynn a gaming license, this Court has looked to the Complaint itself. The gist of the Complaint is that the Commission unlawfully manipulated the gaming license process to favor Wynn. Significantly, the Complaint incorporates by reference some 84 attached exhibits, several of them generated by or filed with the Commission over the eighteen months that it determined first who was a suitable candidate for the Region A license and then which of two candidates found to be suitable (Wynn or Mohegan Sun, LLC) should be awarded a license. Where the Complaint cites these exhibits, this Court has relied on the documents themselves, not the Complaint’s characterization ofwhat they say. Stripped of irrelevant detail and hyperbole, the Complaint, together with the attached exhibits, describes the following series of events.
Wynn began its effort to become the developer of a Massachusetts casino almost as soon as the Gaming Act was passed. It focused that effort first on property near Gillette Stadium in Foxborough. When it became clear that a majority of the town’s Board of Selectmen opposed the casino, Wynn turned its attention elsewhere.
Around that same time period, the Mayor of Everett had begun to market and promote the site of a former Monsanto Chemical plant as a possible location for a Region A casino. The property, located in Everett, sits in close proximity to Rutherford Avenue and Sullivan Square in Boston’s Charlestown neighborhood. It is accessible only through a road known as Horizon Way, part of which passes through Boston. FBT Everett Realty, LLC (FBT) owned the site. At the time, its members included Paul Lohnes, Anthony Gattineri, Dustin DeNunzio, and Charles Lightbody. Lohnes is a friend and former business partner of Commission Chairman Stephen Crosby. Lightbody is a convicted felon with reputed ties to organized crime.
Wynn learned of the availability of the Monsanto Chemical site and initiated discussions with the Mayor of Everett, city officials, and representatives of FBT. In December 2012, Wynn and FBT signed an Option Agreement that provided Wynn with the right to purchase the land for $75 million. Following the execution of the Option Agreement, DeNunzio and Lightbody allegedly arranged to have fraudulent documents prepared to indicate that Lightbody had previously transferred his interest in FBT to Gattineri in exchange for a $1.7 million promissory note. Gattineri, DeNunzio, and Lightbody would later be indicted in state and federal court for attempting to conceal Lightbody’s interest in the Monsanto Chemical site in order to secure Wynn’s purchase of the property. Wynn himself chose to ignore certain “red flags” regarding FBT’s ownership, engaging in only “cursory due diligence” and “wilful blindness.” Complaint at ¶¶172, 189, 190.
In January 2013, Wynn filed its RFA-1 application and the IEB commenced its suitability review. Soon after the filing, Crosby allegedly engaged in ex parte discus *250 sions with Wynn concerning the scope and conduct of the suitability investigation. One result of these conversations was Crosby’s advocacy of a regulation that would permit Wynn to enter into a “host community” agreement with Everett (and have the agreement presented to Everett voters for approval) before Wynn was determined to be a suitable applicant. According to the Complaint, “Wynn recognized that a positive vote [for a casino] by Everett would exert tremendous pressure on the Commission to find Wynn suitable, and then to convince Boston that it was merely a surrounding community.” Complaint at ¶232.
Around this same time period, the land transaction between Wynn and FBT was coming under scrutiny by the Federal Bureau of Investigation and the U.S. Attorney’s Office. In July 2013, the FBI disclosed to the IEB that Lightbody had a continuing ownership interest in FBT and was a convicted felon with reputed ties to organized crime. This prompted the IEB, in coordination ■with the FBI, to initiate its own investigation. The IEB eventually informed Wynn and the Commission that there was evidence that the owners of FBT, including Lightbody, had been attempting to conceal Lightbody’s ownership interest in FBT. Shortly after the IEB reported its findings, Chairman Crosby disclosed his relationship with Lohnes to the State Ethics Commission.
The revelations about Lightbody prompted Wynn, in cooperation with the IEB, to execute an amendment to the Option Agreement. The amendment lowered the purchase price of the land to $35 million, $10 million of which was reserved for environmental clean up, to reflect the fair market value of the property without casino use. The amendment also inserted a clause in the Option Agreement requiring Lohnes, DeNunzio, and Gattineri to sign a Confirmation of Representation verifying that they were the sole owners of FBT and would be the only beneficiaries of the proceeds of the land sale.
In early December 2013, Wynn submitted a “Petition Regarding Everett Land Transaction” to the Commission purporting “to request a response from the Commission regarding the proposed resolution of concerns raised by” the IEB. Chairman Crosby announced his recusal from decisions involving the Option Agreement the same day. A hearing on the petition was held in mid-December at which the Commission determined that the amendment cured the problems raised by the IEB.
In late December, Lohnes and DeNunzio signed Confirmations of Representation. These Confirmations indicated that the proceeds from the Option Agreement would flow to a consultant/lobbyist named James Russo, a long time business associate of Light-body. Although Gattineri refused to sign a Confirmation, he did sign a “Certificate” some months later containing several representations regarding his interest in FBT. The language of that Certificate, however, differed materially from the Confirmation required by the amendment to the Option Agreement.
On December 27, 2013, the Commission issued a favorable Phase I Decision finding Wynn to be a suitable candidate. According to the Complaint, this decision was erroneous for many reasons, primary among them being Wynn’s failure to conduct adequate due diligence of FBT. This suitability decision was allegedly part of an overall effort by the Commission to favor Wynn. What is not mentioned in the Complaint (but is described in the exhibits and certainly cannot be contested) was the fact that Wynn was not the only candidate determined to be suitable: the RFA-1 application of Mohegan Sun, LLC (Mohegan), was also approved. Mohegan proposed to build a casino in the city of Revere.
While the suitability review was underway, a dispute developed between Boston and Wynn (as well as Boston and Mohegan) regarding whether Boston was a host community or a surrounding community in connection ■with their applications. Boston insisted that it was a host community for Wynn’s proposed casino, based on the fact that Horizon Way, which passes through the City, provided the only access to the Monsanto Chemical site. Wynn, on the other hand, took the position that Boston was merely a surrounding community, asserting that the gaming establishment it proposed to build was located entirely in Everett. Wynn also informed the Commission that it intended to construct a new driveway that would provide access to the casino on land located entirely in Everett; at the time, however, it did not own this land but was seeking to purchase it from the MBTA.[1] On March 19, 2014, the City filed a “Declaration” (attached to the Complaint as Exhibit 55) asserting that, regardless of whether Wynn or Mohegan was awarded the license, Boston was a “host community.” By this time, Wynn had filed its RFA-2 Application and had designated Boston as a surrounding community. Going into the licensing phase of the process, this dispute remained unresolved.[2]
The Commission scheduled a public hearing for March 20, 2014 regarding Wynn’s designation of Boston as a surrounding community. Boston made various objections, asserting among other things that its status as a host community had first to be decided. A further hearing was scheduled for April 4, 2014, then postponed until May 8,2014. The stated purpose of the May hearing was to “determine the premises of the gaming establishment,” since it was the Commission’s view that this would decide the issue regarding which municipality was a “host community.” Because Boston had claimed host community-status both as to Mohegan’s and Wynn’s applications, this hearing would decide the issue as to both.
A transcript of the May 8, 2014 hearing is attached to the Complaint as Exhibit 60. At the commencement of the hearing, Crosby recused himself from participating in that hearing and from any further involvement in the licensing decision for Region A. Commissioner James McHugh became acting Chairman. Commissioners heard oral presentations from all interested parties, including the City of Boston, all of whom had also been invited to submit briefs before the hearing. After the *251 presentations, the Commission engaged in “hasty deliberation” and took a vote which was formalized in a written decision issued a week later. Complaint at ¶409. In that decision, (Exhibit 62 to the Complaint), the Commission concluded that Boston was not a “host community” as to either Mohegan or as to Wynn, since the gaming establishment that each intended to build was located entirely outside of the City of Boston.
After the Commission made its determination, Boston declined to enter into a surrounding community agreement with Wynn. It also refused to participate in the mandatory arbitration process. In response, the Commission warned Boston in a letter dated July 30, 2014 (Exhibit 63 of the Complaint) that it would lose its status as a surrounding community if it continued to adhere to its position. One week later, the Commission “followed through on its threat” and de-designated Boston as a surrounding community. Complaint at ¶419. It relied on 205 C.M.R. §125.01(6) (a) in doing so.
In early September, over objections from the City, the Commission began the process of deciding which applicant (Mohegan or Wynn) would receive the Region A license and held a series of public hearings. During this period, the Commission proposed licensing conditions for each applicant and invited the applicants to prepare responses. Because most of Wynn’s casino patrons would be required to travel through Sullivan Square in Charlestown, the Commission proposed several traffic mitigation conditions for Charlestown in connection with Wynn’s application. In response, Wynn put forward its own mitigation plan. Rather than compel Wynn to adhere to its original licensing conditions, the Commission accepted Wynn’s revisions, ultimately adopting a set of “watered down” conditions that did little to mitigate the negative consequences (most notably traffic) arising from the operation of the proposed casino. Complaint at ¶431. On September 17, 2014, the Commission voted to enter into an agreement to award the license to Wynn.
In November 2014, Massachusetts voters defeated a ballot initiative seeking to repeal the Gaming Act. Two days later, on November 6, 2014, the Commission formally awarded the Region A Category 1 license to Wynn, effective November 7, 2014. The Commission subsequently issued a written decision titled “Determination of Issuance of a License to Operate Category 1 Gaming Establishment in Region A,” explaining its reasons for awarding the license to Wynn rather than Mohegan based on the objectives detailed in G.L.c. 23K, §18.
On January 5, 2015, Boston filed a 73-page complaint against the Commission. Six months later, on May 20, 2015, Boston filed an Amended Complaint that was twice as long and added two more counts. The Commission responded with a Motion to Dismiss the Amended Complaint pursuant to Mass.R.Civ.P. 8(a). Specifically, the Commission argued that the Amended Complaint’s “unnecessary prolixity” not only placed an unjustified burden on this Court but also made it virtually impossible for the Commission to effectively answer. Although this Court agreed with the Commission that the Amended Complaint was needlessly long and the legal claims difficult to decipher, I nevertheless denied the motion, concluding that dismissal (which would necessarily be -without prejudice) would only delay the proceedings further. The instant motion, brought pursuant to Rule 12(b)(6) and 12(b)(1) was filed shortly thereafter.
DISCUSSION
Boston brings claims under G.L.c. 231A, §4 (Counts 1-6, 8-10) and under G.L.c. 249, §4 (Count 7). These claims have been pled in a scattershot fashion: one count, for example, will allege multiple violations of the Gaming Act or will challenge one Commission decision based on errors committed in another. The result is that it is virtually impossible for this Court to analyze each claim separately. As best as this Court can determine, however, the counts fall into four categories. Counts 4, 7, 8, and 9 are challenges to the Commission’s decisions finding Wynn suitable (the Suitability Decision) and awarding the Region A license to Wynn (the Licensing Decision). Counts 1, 2, 3, and 5 are challenges to the Commission’s determination that Boston is a surrounding community rather than a host community (the Premises Decision). Count 6 challenges the Commission’s determination that Boston waived its surrounding community status (the De-Designation Decision). Finally, Count 10 seeks to disqualify all Commissioners from any future proceedings regarding Region A on the grounds that their multiple violations of the Gaming Act and alleged bias in favor of Wynn “have raised serious questions about their impartiality.” Complaint at ¶630.
In moving to dismiss, the Commission argues (among other things) that Boston lacks standing to assert those counts challenging the Suitability and Licensing Decisions. As to the remaining claims, the Commission contends that they fail to state a claim upon which relief may be granted. The two arguments are interrelated to some degree. That is, Boston can mount a legal challenge only where it can show that it has suffered some injuiy within the zone of interest protected by the Gaming Act itself. The only injuiy sufficient to give it standing relates to the Premises and De-Designation Decisions. But as to those decisions, the undisputed facts show that the Commission did not violate either the Gaming Act or its regulations. The upshot is that the entire Complaint must be dismissed.
A. Standing
This Court turns first to the question of standing— of critical importance since, in its absence, this Court has no subject matter jurisdiction to decide the matter. To have standing, a plaintiff must jfirst allege an injury that was a direct and ascertainable result of the defendant’s actions. Sullivan v. Chief Justice for Admin. & Mgt. of the Trial Court, 448 Mass. 15, 21 (2006). This is particularly important where the plaintiff asks the court to render a decision on the actions *252 of a government agency. See Tax Equity Alliance v. Commissioner of Revenue, 423 Mass. 708, 715 (1996). “From an early day it has been an established principle in this Commonwealth that only persons who have themselves suffered or who are in danger of suffering legal harm can compel the courts to assume the difficult and delicate duty of passing upon the validity of the acts of a coordinate branch of government.” Kaplan v. Bowker, 333 Mass. 455, 459 (1956). Standing requires a “definite interest in the matters in contention in the sense that [a plaintiffs] rights will be significantly affected by a resolution of the contested point.” Bonan v. Boston, 398 Mass. 315, 320 (1920). Injuries which are speculative, remote, or indirect are insufficient to confer standing. Id.; see also Group Ins. Comm’n v. Labor Relations Comm’n, 381 Mass. 199, 204 (1980) (“Not every person whose interests might conceivably be adversely affected is entitled to [judicial] review”).
Second, a plaintiff has standing only if the injury sustained falls within the “area of concern” or “zone of interests” arguably protected by the statute or regulatory scheme under which the complained of action has occurred. School Comm. of Hudson v. Board of Educ., 448 Mass. 565, 579 (2007). “It is not enough that the plaintiff be injured by some act or omission of the defendant; the defendant must additionally have violated some duly owed to the plaintiffs.” Penal Inst. Comm’r for Suffolk County v. Commissioner of Corr., 382 Mass. 527, 532 (1981) (internal quotes omitted). In analyzing whether an injury is within a statute’s zone of interest, a court examines “the language of the statute in issue; the Legislature’s intent and purpose in enacting the statute; the nature of the administrative scheme; decisions on standing; any adverse effects that might occur, if standing is recognized; and the availability of other, more definite, remedies to the plaintiffs.” Enos v. Secretary of Envl. Affairs, 432 Mass. 132, 135-36 (2000).
Boston contends that the Commission’s unlawful conduct has or will cause it to suffer the following injuries: 1) the loss of the right to hold a referendum on Wynn’s project, negotiate a mitigation agreement and communily impact fees, and receive mitigation funds to address the project’s adverse impacts; 2) the expenditure of public resources to participate in the licensing process and to evaluate the project’s adverse impacts; 3) the impairment of its previously planned efforts to reconfigure Sullivan Square; and 4) traffic, environmental, and public safety impacts once the casino is completed. Boston claims that these injuries are within the Gaming Act’s zone of interests because the Act protects host and surrounding communities. It further contends that these injuries give it standing to challenge not only the Premises and De-Designation Decisions but also the Suitability and Licensing Decisions. This Court is not persuaded that the Cily’s interest as a host or surrounding communily vis a vis a Wynn casino entitles it to challenge all aspects of the licensing process.
The injuries alleged by the City flow directly from the decisions regarding its status as a host community and a surrounding community and would not have been sustained at all if the Commission had reached a different decision on these discrete issues. Thus, if the Commission had determined that the Ci1y was a host community, Wynn would have had to enter into a host community agreement with Boston and provide it with community impact fees and mitigation commitments intended to address the casino’s adverse impacts, including those concerning traffic in Sullivan Square. Boston’s citizens also would have been entitled to vote in a referendum on the proposed casino. Similarly, if the City as a surrounding community was not subject to losing that status (as the Commission found), then Wynn would have had to enter into a surrounding community agreement with Boston. Pursuant to that agreement, Boston could have extracted from Wynn substantial fees and mitigation commitments.
In contrast, the Suitability and Licensing Decisions are only tangentially related to the harms that Boston complains of. For example, the Complaint goes on for many pages about Lightbody’s connection to FBT, the entity from which Wynn purchased the land that would become the site of its proposed casino. Butit does not explain how that connection resulted in any injury to Boston. Others competing with Wynn during the suitability phase might have some basis to complain, but Boston’s interest at that point was entirely inchoate. Similarly, several of the defects that Boston points to in the RFA-2 part of the process have no bearing on whether Boston would be able to exact more stringent conditions on Wynn to ameliorate the impact of the casino on the City. For example, the Complaint alludes to defects in Wynn’s purchase of land from the MBTA, and also alleges that the Commission’s approval of the license was fatally premature because it occurred before final certification of the project under the Massachusetts Environmental Policy Act. But this Court fails to see how these alleged irregularities impacted Boston, much less caused it to suffer any injury sufficient to give it standing. The fact is that the injuries that Boston claims to have suffered at the hands of the Commission do not flow from the choice that the Commission made between two applicants (Wynn and Mohegan) but from Boston’s location vis a vis any proposed casino. Its standing is thus necessarily limited to challenging only those Commission decisions regarding the rights that it had (if any) as a host or surrounding community for the casino applicant that was ultimately successful in obtaining a gaming license.
Standing also requires that the injury alleged must fall within the zone of interest protected by the statute. The Gaming Act does express concern for the impact of a proposed casino on host and surrounding communities, giving the Cfiy a basis to claim that its grievances against the Commission about the misapplication of those statutory provisions falls within the zone of interest protected by the regulatory scheme. Beyond those provisions, however, the Act quite clearly limits the *253 class of individuals or entities that can complain of the Commission’s actions, expressly curtailing if not outright precluding any judicial review as to certain decisions. See, e.g., G.L.c. 23K, §17(g). In addition, the comprehensive nature of the Gaming Act with its broad delegation of authority to the Commission strongly suggests a legislative intent to have the types of decisions at issue here made not by a reviewing court but by the agency charged with administering it. Under such circumstances, it is even more important that the courthouse doors be open only to those whom the Gaming Act was designed to protect. Beyond its status as a host or surrounding community, the City of Boston is no different than a member of the general public unhappy with (but not injured by) the Commission’s acts.
B. Failure to State a Claim
The Commission does not challenge Boston’s standing to bring Counts 1, 2, 3 and 5, which challenge the Premises and De-Designation Decisions, or Count 10, which seeks the Commissioners’ disqualification.[3] Rather, it argues that these counts fail to state a claim upon which relief may be granted under Mass.R.Civ.P. 12(b)(6) The Court agrees.
This Court first addresses the Commission’s decision that Boston is not a “host community” under the Gaming Act. The Act defines a host community as “a municipality in which a gaming establishment is located or in which an applicant has proposed locating a gaming establishment.” G.L.c. 23K, §2 (emphasis added). A “gaming establishment,” in turn, is defined as “the premises approved under a gaming license which includes a gaming area and any other nongam-ing structure related to the gaming area and may include, but shall not be limited to, hotels, restaurants or other amenities.” Id. (Emphasis added.) Certainly, a common sense reading of these provisions would suggest that the issue is simply a matter of geography: if no part of the “gaming establishment” is located in the City of Boston, then it cannot be a “host community.” The site plan for Wynn’s proposed casino is before the Court and it cannot be disputed that its boundaries fall entirely within the City of Everett.
Boston contends that G.L.c. 23K, §2 must be read more broadly and relies on two sets of factual allegations in its Complaint to support its position that it has stated a claim upon which relief may be granted. First, it alleges that Horizon Way (at least part of which lies in Boston) provides important (if not exclusive) access to the casino site and thus must be considered part of the “premises.”[4] Second, noting that the “premises” of a gaming establishment also includes “other amenities,” Boston argues that Wynn’s intent to partner with certain facilities located in the City and to transport its patrons via a water shuttle to other Boston locations means that there will be gaming establishment “amenities” that fall within City limits. These identical argument were made to the Commission, which considered and ultimately rejected them in a thorough and well-reasoned opinion that was attached to the Complaint as Exhibit 62. This Court can discern no legal error in that decision.
In determining what should be part of a “gaming establishment” under the Gaming Act, the Commission asked itself whether the feature at issue was: a) a non-gaming structure; b) related to the gaming area; and c) under common ownership and control of the gaming applicant. Assuming that all three of these requirements were satisfied, the Commission further determined that there had to be some regulatory interest in including that feature as part of the gaming establishment to be licensed. As to Horizon Way, the Commission concluded that this was not a “non-gaming structure” nor was it subject to Wynn’s control or under his ownership. As to the marketing agreements that Wynn had entered into with certain entities located in the City, such agreements were actually encouraged by the Gaming Act in order to get gaming establishment patrons to visit other regional attractions. That patrons may take advantage of Boston facilities does not make these facilities, which are neither owned nor controlled by Wynn, part of the gaming establishment, however. The Commission’s construction of the statutory language is (in this Court’s view) correct as a matter of law, even without according the Commission some the deference that is entitled to receive. See, e.g., Attorney Gen. v. Commissioner of Ins., 450 Mass. 311, 319 (2008); Commerce Ins. Co. v. Commissioner of Ins., 447 Mass. 478, 481 (2006). Indeed, if this Court were to adopt the city of Boston’s interpretation of G.L.c. 23K, §2, then it would essentially make meaningless the Act’s definition of what constitutes a surrounding community, which specifically includes those municipalities that provide “ready access” to a gaming establishment.
The Commission did find that Boston was a “surrounding community.” But as the Complaint itself acknowledges, Boston refused to engage in the arbitration procedures mandated by 205 C.M.R. §125.01(6) in the event that the applicant and the surrounding community could not reach an agreement within a specified time period. The GamingAct specifically granted the Commission the authority to establish “protocols and procedures” in such situations. See G.L.c. 23K, §17(a). Boston nevertheless maintains that the Commission exceeded its authority under the statute and that 205 C.M.R. §125.01(6) is invalid. This Court disagrees.
Analyzing the validity of an agency’s regulations involves a two-stage inquiiy. A court first determines “whether the Legislature has spoken with certainty on the topic in question.” Goldberg v. Board of Health of Granby, 444 Mass. 627, 632-33 (2005). If it has done so, the Court “give[s] effect to the Legislature’s intent.” Id. If, however, the Legislature has not directly addressed the issue, the court analyzes “whether the agency’s resolution of that issue may ‘be reconciled with the governing legislation.’ ” Id. at 633, quoting Nuclear Metals, Inc. v. Low-Level Radioactive Waste *254 Mgt. Bd., 421 Mass. 196, 211 (1992). In making this determination, the court does not consider whether it would have interpreted the statute in the same manner as the agency. Id. at 633. Rather, it focuses solely on whether the agency’s interpretation of the statute was reasonable. Biogen IDECMA, Inc. v. Treasurer and Receiver Gen., 454 Mass. 174, 187 (2009).
A plaintiff seeking a declaration that a regulation is ultra vires (as Boston contends) has a formidable burden. Student No. 9 v. Board of Educ., 440 Mass. 752, 762 (2004). An administrative agency has considerable leeway in interpreting its governing statute. Id. A court must give substantial deference to the agency’s interpretation of the statute and apply all rational presumptions in favor of the regulation’s validity. Id. at 762-63. It “will not declare a regulation void unless its provisions cannot, in any appropriate way, be interpreted in harmony with the legislative mandate. ” Id. at 763; see also Biogen IDEC MA, Inc., 454 Mass. at 187.
Section 17(a) of the Gaming Act mandates that the Commission establish “protocols and procedures for ensuring the conclusion of a negotiation of a fair and reasonable agreement between an applicant and a surrounding community in order to allow the applicant to submit a timely and complete application. ” It does not describe what form those protocols or procedures must take. Because the statute neither explicitly forbids nor expressly allows the regulation at issue, this Court must determine whether the regulation reflects a reasonable interpretation of the statute. The Court concludes that it does.
Protracted negotiations over surrounding community agreements could delay the submission of complete applications and the licensing process more generally. To avoid that, Section 17(a) tasks the Commission with crafting a mechanism to ensure a timely conclusion to negotiations. A binding arbitration process and the Commission’s ability to de-designate a surrounding community that refuses to participate in arbitration serve this purpose. The threat of arbitration and de-designation is a vehicle to ensure that negotiations come to an end and that one party’s intractability cannot hold up the licensing process. Moreover, while the statute does not explicitly permit de-designation, such a power can be implied from the Commission’s authority to designate municipalities as surrounding communities, see G.L.c. 23K, §17(a), as well as from other provisions of the statute. See, e.g., G.L.c. 23K, §§1,4. In short, the Commission’s decision to de-designate Boston was correct as a matter of law.
Turning then to the only remaining count of the Complaint, this court determines that it too fails to state a claim upon which relief may be granted. In Count 10, Boston seeks a declaration that all the Commissioners are disqualified from further participating in the proceedings involving Region A. It relies on G.L.c. 23K, §3(u)(v), which requires Commissioners to “disqualify themselves from proceedings in which their impartiality might reasonably be questioned.” Boston also seeks the annulment of all Commission decisions and actions with respect to Region A, relying on the Conflict of Interest Law, G.L.c. 268A, §9(a). This Count does not contain sufficient factual allegations, however, “to raise a right of relief above the speculative level.” Iannacchino v. Ford Motor Co., 451 Mass. at 636, quoting Bell Atl. Corp. v. Twombly, 550 U.S. at 555-57.
Certainly, the Complaint contains several specific allegations about Chairman Crosby, alleging that he engaged in ex parte communications with Wynn and that, as result of his relationship to Paul Lohnes, one of the owners of FBT, he had a conflict of interest. As the complaint itself acknowledges, Crosby (while denying all of these allegations), recused himself entirely from participating in any part of the Licensing Decision and also recused himself from the particular vote by the Commission that involved Lohnes and FBT. This Court sees no factual or legal basis for disqualifying Crosby from all future decisions made with regard to Region A.
As to claims that the other four Commissioners must also be disqualified, this is even more spurious. The Complaint does not contain any fact allegations that would reasonably call into question their impartialify or that would suggest that illicit factors influenced their votes. Indeed, when a court is reviewing the actions of an administrative agency, “[flhere is every presumption in favor of the honesiy and sufficiency of the motives actuating public officers in actions ostensibly taken for the general welfare.” LaPointe v. License Bd. of Worcester, 389 Mass. 454, 459 (1983). The Complaint falls far short of alleging facts that might possibly overcome this general presumption.
CONCLUSION AND ORDER
For the forgoing reasons, the Defendants’ Motion to Dismiss Boston’s Amended Complaint is ALLOWED and it is hereby ORDERED that the Amended Complaint be DISMISSED.

 Wynn was eventually successful in purchasing this land from the MBTA. That purchase was the subject of a separate lawsuit filed by certain named taxpayers. See Abdow v. MBTA et al., SUCV2015-2026-BLS 2. On October 15, 2015, this Court dismissed that lawsuit on standing grounds [33 Mass. L. Rptr. 126]. The MBTA land transaction is also described in Boston’s Complaint, with the alleged defects in that transaction cited as yet another basis for vacating the award.

 The dispute also remained unresolved with respect to Mohegan. Like Wynn, Mohegan took the position that Boston could not be a “host community” because no part of the gaming establishment that it proposed to build was located within the City of Boston.

 The Commission also argues that the claims (together with all other claims asserted by Boston) are time barred and that the City has no right of judicial review pursuant to G.L.c. 249, §4. This Court need not address these arguments, given its rulings regarding standing.

 Wynn was ultimately able to acquire land from the MBTA to provide a second means of access. This has been the subject of separate litigation. See footnote 1.